**John Christopher SAWYERS, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 69184.

Court of Criminal Appeals of Texas, En Banc.

Oct. 29, 1986.

Douglas M. O'Brien, Charles F. Baird, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and J. Harvey Hudson, George Godwin and Keno Henderson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

OPINION

McCORMICK, Judge.

Appellant was convicted of capital murder. Punishment was assessed at death.

In his first ground of error, appellant contends that prospective juror Dr. Vernon Ray Walling II was erroneously excused in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

The record shows that during initial questioning by the trial judge Walling expressed opposition to the death penalty:

"Q. All right, sir, I must go into the matter further with you. I don't mean to quarrel with you but the law requires that I talk to you about it greater than that. Are you telling me that no matter what the facts were and no matter what the State proved to you, even though you considered it to be proper, that under no circumstance could you ever participate in a verdict that would require the Court to assess the death penalty?

"A. That's correct."

During examination by the State, Walling reiterated his feelings:

"Q. Doctor, the Judge has explained to you the procedure with regard to the question. There would be the first part of the trial which deals with the guilt of a person and if the person is found guilty then we go on to the second stage of the trial, and from what I understand from what you said to the Judge, you could under no circumstance vote to assess the death penitentiary (sic) in any case?

. . . . .

"A. That's correct."

Defense counsel again explained to Walling that the jurors did not in fact assess the death penalty, but rather only answered the special issues, whereupon, depending upon the answers to the special issues, the trial judge assessed the penalty. The following then occurred:

"Q. Okay now, do you feel like that you could answer issue number one based according to the evidence? If the State proved to you beyond a reasonable doubt that issue number one should be answered yes do you feel like you could answer issue number one yes?

"A. Yes.

"Q. Okay now, issue number two is whether there is a reasonable probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Let's assume that at the punishment phase of the trial the State offered evidence to you and proved to you beyond a reasonable doubt that the defendant would in fact commit future acts of violence and it could take the form of all sorts of evidence. It could be many prior convictions of the defendant. It could be extraneous offenses where he killed numerous people. All types of evidence could be introduced on that issue and if the State proved to you beyond a reasonable doubt issue number two should be answered yes do you feel like you could answer issue number two yes?

"A. Yes."

Thereafter the trial judge tried to resolve the conflict in Walling's answers:

"Q. All right, then do I understand that your answer now is that if the state proved to you beyond a reasonable doubt that both of those questions should be answered yes that you could answer them yes knowing that the Court would be required to assess the death penalty?

"A. It really puts one in a bind.

"Q. It sure does. Welcome to the N.F.L.

. . . . .

"Q. If the State proves to you beyond a reasonable doubt that both of those questions should be answered yes could you participate in a verdict answering both of them yes knowing that it would require the Court to assess the death penalty?

"A. No.

"Q. You could not?

"A. No.

. . . . .

"Q. Would you, because you knew that yes answers to both of them would require the Court to assess the death penalty, would you, even though the State proved beyond a reasonable doubt that both of them should be answered yes, would you answer one or both of them no?

"A. I would."

The prosecutor then concluded the voir dire examination with the following:

"Q. Doctor, then you are saying regardless of the evidence, it doesn't make any difference—if you believed beyond a reasonable doubt the questions should be answered yes, because of the way you feel and because of what would happen, you're going to answer one or both of them no because you could not participate in an answer that would call for the death penalty?

"A. Yes, sir.

"Q. And would you say that's your true answer as opposed to what you just told the Defense Attorney (sic), based on the evidence?

"A. Well, it's clear to me now.

"Q. So, regardless of the evidence, you would answer one of those questions no to make sure the person didn't get the death penalty by your vote?

"A. Yes.

"Q. And you are saying that even if the State proved beyond a reasonable doubt that both of them should be answered yes to you that you would still answer one of them no to insure that you did not participate in a proceeding where someone received the death penalty?

"A. Yes. I do not want to participate if there is a possibility of the death penalty."

Thereupon Walling was excused for cause over appellant's objection.

■ Our reading of the voir dire examination shows that the initial inconsistency in Dr. Walling's answers stemmed from his confusion over the procedure used during the punishment phase of the trial. Once it became clear to Dr. Walling what would be expected of him as a juror, he remained steadfast in his resolve to vote against the death penalty no matter what the evidence revealed. We find that Dr. Wall's voir dire examination reads very similar to the voir dire examinations of prospective jurors Sells and West in *Vanderbilt v. State*, 629 S.W.2d 709 (Tex.Cr.App.1981). This Court found that where both women indicated they could follow the law but further examination resulted in the women concluding that they did not believe they could answer the punishment questions "yes" knowing that a death sentence would result from a unanimous verdict, both women were properly challenged for cause pursuant to *Witherspoon v. Illinois*, supra. Compare *Turner v. State*, 635 S.W.2d 734 (Tex.Cr. App.1982), in which the potential juror, although opposed to the death penalty, clearly indicated that he could return a verdict consistent with the instructions of the court and facts proved. We find no error in the trial court's exclusion of Dr. Walling. Appellant's first ground of error is overruled.

In his second ground of error, appellant argues that the trial court erred in terminating the defense counsel's questioning of venireperson Plummer in violation of this Court's decision in *Perillo v. State*, 656 S.W.2d 78 (Tex.Cr.App.1983). In *Perillo v. State*, supra, the prospective juror Vennard vacillated during questioning by both the trial judge and the prosecutor as to whether he would follow the law and answer the special issues in accordance with the evidence or whether he would ignore the evidence and answer at least one of the special issues in the negative so that the defendant would receive a life sentence rather than the death penalty. Before defense counsel had an opportunity to question Vennard, the trial judge excused Vennard for cause. When defense counsel requested permission from the trial judge to examine Vennard, the trial judge refused. This Court reversed Perillo's conviction after reviewing the record and determining that there was nothing therein that would guarantee that "had appellant's trial counsel

been given the opportunity to question him, Vennard would not have returned to his former position, and agreed that he could have found appellant guilty of capital murder and thereafter would have answered in the affirmative the statutory special issues." *Perillo v. State*, supra at p. 81.

■ We have reviewed the record of the instant case and find *Perillo v. State*, supra, to be quite distinguishable and thus inapplicable from the case at bar. We note initially that error has not been preserved. At the time that the trial court terminated defense counsel's questioning and excused Plummer for cause, the only objection voiced by defense counsel was:

"MR. O'BRIEN: Your Honor, for the purpose of the record, we object to him being excused for cause."

No objection was voiced as to the limitation nor was request made for additional time of the voir dire examination. It has long been the rule that error is not preserved when the error presented on appeal is not the same as the objection raised at trial. *Vanderbilt v. State*, supra, at 721.

■ Secondly, in *Perillo*, defense counsel was not allowed to conduct *any* examination of the prospective juror. In the instant case, examination by both the trial judge and the prosecutor revealed that Plummer was undeniably so opposed to the death penalty that in no situation would he answer the special issues affirmatively. Defense counsel was allowed to question Plummer and this questioning further showed Plummer's adamance in refusing to answer the special issues affirmatively.

(THE COURT)

"Q. If you thought it was right under all the facts could you vote for a verdict that would require the Court to assess the death penalty?

"A. No, ma'am.

"Q. Under no circumstance? I am not trying to quarrel with you.

"A. You did say the punishment—could I give the punishment of death?

"Q. Un-huh, if you thought it was the right thing to do under all the circumstances.

"A. No, ma'am.

. . . . .

(THE PROSECUTOR)

"Q. A case in Texas is in two parts—a criminal case. A capital murder case is one where the State must prove that a defendant is guilty of the offense of capital murder. That is the first part of the trial. If the jury finds the defendant guilty of the offense of capital murder then we move to the second part of the trial. The second part of the trial is where the punishment is assessed. It must be done by the jury in a capital murder case. The jury at that time answers two questions. By the answer to those questions the Judge is required to do one or the other of the things. If the jury answers both questions yes the Judge has no alternative. The judge must sentence that person to death. If the jury answers either one or both of those questions no then the Judge must assess the life judgment—the life sentence.

. . . .

"Q. Now, do you think that your feeling with regard to what might happen at that second stage is strong enough that it would cause you problems in giving a fair reading to the evidence at the first part of the trial? That is, do you think you would have a hard time finding someone just guilty of the offense of capital murder because you knew what was coming?

"A. Well, let me see. I could judge fair but I also would not answer the two questions that would give a person the death penalty.

"Q. ... Let's say the jury has already found the defendant guilty of the offense of capital murder and you are on it and we get to the punishment stage.... And you would get the two questions called issue one and issue two that are to your left on that piece of cardboard. Would you turn there and read those over.

"A. Are these the two questions that you would have to answer for death?

"THE COURT: Yes, sir.

"A. Well, if that is what it says—I mean if that is what it means I couldn't follow those two issues.

"Q. You are just saying it doesn't make any difference what the evidence was, you would just refuse to answer them because you would know what might happen?

"A. I just can't put a verdict on a person's life."

At this point the State challenged for cause and the defense counsel was allowed to question the juror in an attempt at rehabilitation.

(THE DEFENSE ATTORNEY)

"Q. ... Now the way it works is you have to answer those questions and let me first ask you if you can answer special issue number one based upon the evidence? Would you look over there at it. Let's say for instance you are a juror in a capital case and the State has proven to you beyond a reasonable doubt that special issue number one should be answered yes. First let me ask you whether or not if the State proves to you beyond a reasonable doubt the issue should be answered could you answer special issue number one?

"A. If the Court asked me if this person committed murder deliberately?

"Q. Right.

"A. Well, and this was proven that he did commit murder deliberately?

"Q. Right.

"A. Okay no, I guess the law—everybody have to be sentenced and punished. I understand this but I could not punish a human being with death.

. . . . .

"Q. I am just asking you whether or not you have the capability to listen to the evidence and answer that question either yes or no?

"A. I don't know.

. . . . .

"Q. Okay, do you know on issue number two?

"A. Do (sic) that mean if he be set free that he would continue doing the same thing?

"Q. Right, or whether or not in prison he would continue doing the same thing.

"MR. HENDERSON: We object, Your Honor.

"THE COURT: That is not what it means.

"Q. Well, as a part of society.

"A. That could be punishment for fifty years or twenty-five years and, sir, I imagine a criminal have to be punished but the only thing I am saying is I cannot give punishment by death."

At this point the trial court terminated the voir dire examination and excused the juror for cause.

In *White v. State*, 629 S.W.2d 701 (Tex. Cr.App.1981), this Court found no reversible error when the trial court refused to allow the defense attorney to question the prospective juror Grace as to whether she could envision any situation in which she might vote for the death penalty. This Court wrote the following:

"The court erred in not granting the appellant's request to examine Grace further. Such errors are not reversible when, as here, the record shows that the venire member was questioned at length and that she unequivocally stated that she could not vote for the death penalty under any circumstances. *Burns v. State*, 556 S.W.2d 270, 276–278 (Tex.Cr. App.), *cert. denied*, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977); *Huffman v. State*, 450 S.W.2d 858, 860 (Tex.Cr.App. 1970), *death penalty vacated*, 408 U.S. 936, 92 S.Ct. 2860, 33 L.Ed.2d 753 (1972). See *Ortega v. State*, 462 S.W.2d 296, 303–304 (Tex.Cr.App.1970)." 629 S.W.2d at 706.

We find no reversible error in the trial court's action. Compare *Rougeau v. State*, 651 S.W.2d 739 (Tex.Cr.App.1982). This ground of error is overruled.

In his third ground of error, appellant complains of the exclusion of prospective

juror Rita Mae Bowser. Throughout her voir dire examination, Bowser repeatedly stated that in answering the second punishment issue, she would hold the State to a more stringent standard of proof than "beyond a reasonable doubt." A clear example of her feelings on the standard of proof is shown in the following excerpt of voir dire by defense counsel:

"Q. You may be in certain situations and so if you were to serve as a juror armed with this additional information you would then be called upon by the law to determine whether or not the State has proven to you beyond a reasonable doubt, as you interrupt (sic) that phrase to be, that this probability exists and so if you were, in a proper case, presented with this additional information that we have talked about, do you feel that in all—do you feel that in that situation you could just hold the State to the burden of proof and not require more than beyond a reasonable doubt.

"MR. GODWIN: Your Honor, we object to the question in the form it's in. The way he has stated the question, she would be offered more evidence.

"THE COURT: Sustained. Are your (sic) saying you would always require more than beyond a reasonable doubt?

"A. I would almost want absolute proof because I think it would be hard for a human being to answer.

.     .     .     .     .

"Q. Are you telling me then, ma'am, that—well, are you saying that you would require more then beyond a reasonable doubt in all fact situations? Fact situations differ.

.     .     .     .     .

"A. I need to answer this yes or no. I would say yes.

"Q. So, your answer is you would require more than the law requires of the State in all cases?

"Juror nodded her head in the affirmative.

.     .     .     .     .

"Q. Do you understand, Miss Bowser, that there is no definition of what beyond a reasonable doubt means?

"A. Yes.

"Q. And that it may be—reasonable doubt would be as you individually interrupt (sic) that phrase to be and not what anybody else means. It's what you determine that to mean.

"A. Yes, I understand that.

"Q. And do you feel that in all cases in deciding what the proper punishment should be that you would require the State to prove beyond a shadow of doubt or beyond all doubt that the answer should be yes?

"A. Yes."

Appellant phrases his ground of error as an *Adams* issue. That is, he argues that Bowser was wrongfully excused because she in effect stated that her deliberations would be "affected" by the possibility of the death penalty, meaning only that the eventual penalty would cause her to deliberate with greater seriousness than she would in a non-death penalty case. *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

■ Our reading of the voir dire, however, shows that Bowser was not in the same class of prospective jurors as those who were improperly excluded in *Adams v. Texas,* supra, *Durrough v. State,* 620 S.W.2d 134 (Tex.Cr.App.1981) and *Pierson v. State,* 614 S.W.2d 102 (Tex.Cr.App.1980). Rather she belonged to the class of jurors which this Court has held to have been properly excused after they have voiced the opinion that they would hold the State to a more stringent standard of proof than that required by the statute, "beyond a reasonable doubt." We find that she was properly excluded for cause under Article 35.-16(b)(3), V.A.C.C.P., which provides for the exclusion of a prospective juror who "has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment." *Bodde v. State,* 568 S.W.2d 344 (Tex.Cr.App.1978). See also *Hawkins v. State,* 660 S.W.2d 65 (Tex.Cr.App.1983) and *Woolls v. State,* 665

S.W.2d 455 (Tex.Cr.App.1983). This ground of error is overruled.

In his next ground of error, appellant complains that prospective juror Patricia Meadows was wrongfully excused for cause because she did not express a bias sufficient to warrant her exclusion. During the voir dire examination, Patricia Meadows testified that she had three good friends who were police officers. She also testified that her husband had been arrested for receiving stolen goods and had received a sentence of ten years probation. She related that she and her husband awoke one morning at 3:00 a.m. and found several policemen standing over their bed pointing guns at them. Her husband was immediately arrested and was jailed for three months before his case was resolved. Meadows stated that someone had given them the property in payment of a loan and they had no idea the property was stolen. To make matters worse, after the person who gave them the property was arrested, he was released on his own "personal recognizance" and was never seen again.

After hearing this story, the prosecutor attempted to pinpoint Meadows' feelings regarding the credibility of police officers:

"Q. Well, what I am concerned about, of course, is there are going to be police officers that testify with regard to this case and all of us have feelings and our feelings are shaped by things that happen to us—not necessarily things that we want to happen to us—and our feelings are not necessarily feelings that we would like to have but they are our feelings nonetheless. I am, of course, because of this experience, concerned as to whether or not you night (sic) have some feeling with regard to the way a police officer might handle his business or something that he might do. Can you see my concern?

"A. Yes, sir.

"Q. Do you think that you would have that sort of difficulty maybe in giving a police officer a fair shake when he took the stand?

"A. It's possible. Every officer is different. It's hard to tell. It depends on his presentation and the way he acted.

"Q. ... It's awfully hard for us sometimes to make our feelings and thoughts go away to the degree that we think they wouldn't enter our decision making process. That's what I am probing to try to find out, if you think honestly in your heart and in your mind, if you think that because of what has happened you might have a tendency to view a police officer's testimony in a little different light than you would have say a couple of years ago?

"A. Well, sir, I really wouldn't know how I would react until it happened. I don't know if I would give a favorable or disfavorable opinion because of that.

"Q. Okay, by virtue of what happened then, you are telling me that it would absolutely not—can you tell me that it would absolutely not interfere with your decision making process?

"A. I can't say that. I can't say it would not.

. . . . .

"THE COURT: Either you can assure us that you can be fair or you can tell us you can't.

"A. Well, I cannot assure you that I could be fair. I could not make an assumption or assure you of that.

The State then challenged for cause and the trial judge turned Meadows over to defense counsel for questioning. Initially, Meadows testified that she wouldn't know how she would judge a police officer's testimony. However, when defense counsel asked if she would believe the testimony of her three police officer friends, she answered affirmatively. Defense counsel then explained that it would be her duty if accepted as a juror to listen to each officer's testimony and judge his or her credibility based only on what she heard and saw from the witness stand. He then posited the following:

"Q. And when they testify and you don't believe them you don't have to believe them. That's your job. On the other hand, if he comes in and he is one of the good police officers that you feel like is telling the truth, you might believe every word he says, but that is the fact finding experience or fact finding purpose of the jury and that's your job to determine the credibility. So, you think that you could fairly listen to it and listen to them and make that determination whether they are telling the truth or whether they are lying?

"A. No, sir, because I don't know if—I don't know if the situation of my past experiences would bring themselves to the surface unintentionally.

"THE COURT: Okay, are you telling us that you feel that you could not be a fair and impartial juror?

"A. I might be biased. I might be unfair to a police officer ...

"THE COURT: You're going to have to make up your mind one way or the other. Either you can be fair and impartial or you can't.

"A. I don't believe I could.

"THE COURT: All right, are you telling me that—and I don't care which it is one way or the other. It doesn't make any difference. Are you telling me because of your prior experiences at the time your husband was arrested that you could not fairly listen to the testimony of a police officer and judge his credibility as you would anybody else?

"A. Yes, ma'am.

At that point the juror was excused for cause.

At the time of appellant's trial, Article 35.16(a)(9), V.A.C.C.P., provided that a prospective juror could be challenged by either the state or the defense if he had a bias or prejudice in favor of or against the defendant.[1] In *Hernandez v. State*, 563 S.W.2d 947 (Tex.Cr.App.1978), this Court held that where a prospective juror stated that she believed a police officer would always tell the truth, this belief constituted a bias against the defendant. We found that because of her belief in the veracity of police officers, the juror would not be able to impartially judge the credibility of any police officer witnesses. Applying this reasoning in the converse, if the prospective juror stated that she believed a police officer would always lie, this belief would constitute a bias *in favor* of the defendant and also warrant reversal under the statute. The question now to be resolved is whether the testimony of prospective juror Meadows was sufficient to show such bias.

■ Our reading of the voir dire establishes that although Meadows initially hesitated in giving a firm answer as to whether her deliberations would be affected by a police officer's testimony, by the end of the voir dire examination, she clearly and unequivocally affirmed that she could not clearly and fairly evaluate the testimony of a police officer, and thus was properly excused for cause. *Hernandez v. State,* supra.

Appellant argues that Meadows's bias was not established as a matter of law and thus the trial judge abused her discretion in excusing Meadows. In *Anderson v. State,* 633 S.W.2d 851 (Tex.Cr.App.1982), this Court wrote that when bias or prejudice are not established as a matter of law, the decision to excuse the prospective juror because of bias or prejudice is left to the discretion of the trial judge. Absent a clear showing that the trial court abused its discretion, its decision should not be disturbed on appeal. We have read the entire voir dire examination of Meadows and find that Meadows' bias was established as a matter of law. However, even if we held that her bias had not been conclusively established, the record does not support a finding that the trial judge abused her discretion. This ground of error is overruled.

In his next ground of error, appellant argues that the trial court erred in failing to charge the jury on the law of intoxi-

---

1. Article 35.16(a)(9) (1983 Supp.), V.A.C.C.P., now provides that a prospective juror may be challenged for cause if "he has a bias or prejudice in favor of or against the defendant."

cation at the punishment phase of the trial. V.T.C.A., Penal Code, Section 8.04(a), provides that voluntary intoxication does not constitute a defense to the commission of a crime. However, V.T.C.A., Penal Code, Section 8.04(b) and (c) provide the following:

"(b) Evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried.

"(c) When temporary insanity is relied upon as a defense and the evidence tends to show that such insanity was caused by intoxication, the court shall charge the jury in accordance with the provisions of this section."

At the time of the commission of the offense and appellant's trial, V.T.C.A., Penal Code, Section 8.01(a), entitled "Insanity", provided:

"(a) It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of mental disease or defect, either did not know that his conduct was wrong or was incapable of conforming his conduct to the requirements of the law he allegedly violated." [2]

In *Hart v. State*, 537 S.W.2d 21 (Tex.Cr. App.1976), this Court read those two provisions together and held that in order for a defendant to avail himself of the mitigation provision of Section 8.04, supra, a defendant must, as the result of the intoxication, (1) "not know his conduct was wrong" or (2) have been "incapable of conforming his conduct to the requirements of the law he violated." The *Hart* opinion went on to hold that where the evidence only showed that the defendant was intoxicated, the evidence did not justify the submission of an issue on temporary insanity caused by intoxication and there was no error in the trial court's refusal to submit such an instruction to the jury.

We find the same situation in the instant case. Two of appellant's former coworkers testified that on the afternoon of February 2, 1983, appellant came to the car wash where they were employed. Both individuals testified that appellant seemed intoxicated or high but there was no testimony as to temporary insanity as discussed in Section 8.01, supra. Furthermore, there is no testimony in the record which shows how close in time appellant's visit to the car wash was to the commission of this capital offense. There is nothing in the record to suggest that appellant was intoxicated when the offense was committed. We find that the trial court properly refused appellant's requested instruction.

In his sixth ground of error, appellant argues that his written confession was admitted into evidence in violation of Articles 38.21 and 38.22, V.A.C.C.P., the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Texas Constitution. The gist of appellant's argument is that after the arresting officers read him the *Miranda* warnings, appellant invoked his right to remain silent, but the officers continued to interrogate him with the end result being that appellant gave not only a written statement but also a tape-recorded oral statement.

On February 4, 1983, the victim, a sixty-eight year old woman, was found dead in her home by neighbors who became concerned when they had not seen her for several days. Death was attributed to head injuries and police recovered an iron skillet with a broken handle, which was later determined to be the murder weapon. Police also found that the victim's car and several of the victim's rings were missing from the victim's home. Several days later police learned that appellant had been driving the victim's car on February 2, 1983, and had been involved in a car accident.

**2.** Effective August 29, 1983, V.T.C.A., Penal Code, Section 8.01(a) was amended to read: "It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong."

This opinion does not purport to construe the effect of this amendment on V.T.C.A., Penal Code, Section 8.04(b) and (c).

Police also learned that someone using appellant's name had pawned the victim's rings at a local pawn shop. Based on this information, police obtained a warrant for appellant's arrest for the offenses of unauthorized use of a motor vehicle and theft. A hearing on appellant's motion to suppress the statements was held and at the conclusion of the hearing the trial court granted the motion to suppress as to appellant's oral statement but denied it as to appellant's written statement.

The evidence at the hearing on the motion to suppress showed that appellant was arrested at his apartment pursuant to the arrest warrant sometime after 6:45 p.m. on the evening of February 11, 1983, by Detectives Welch, Hoffmaster, Parish and Calhoun of the Houston police department. After informing appellant that he was under arrest, Detective Welch recited the *Miranda* warnings to appellant and he was led outside where he was handcuffed and taken to a car. The detectives testified that appellant gave no response to the *Miranda* warnings but appeared to understand the warnings. As soon as Detectives Welch and Hoffmaster got into the car with appellant, they again read him his *Miranda* rights. Appellant was immediately transferred downtown to the Houston police department and during the twenty minute ride, Welch asked appellant where he had gotten the car that he had been driving at the time of the accident. The appellant replied that he had bought the car from his mother. When Welch asked appellant if he had been involved in the killing of the victim, appellant denied any involvement. Welch informed appellant that the police knew the car did not belong to appellant's mother but belonged to the victim and they also knew that someone using appellant's name had pawned several rings stolen from the victim at a nearby pawn shop. The appellant told Welch he had not pawned the rings. When they arrived at the police station, Welch and Hoffmaster immediately took appellant before a magistrate. Both detectives testified at the hearing on the motion to suppress and at trial, that while the magistrate was reading appellant his *Miranda* rights,

the appellant twice tried to interrupt her and tell her of his involvement in the offense. The magistrate stopped appellant and told him that she did not want to hear his story and that she was there only to give him his legal warnings. The statutory warning form completed by the magistrate and introduced into evidence shows that she completed giving appellant the warnings at 7:53 p.m. After the magistrate concluded warning appellant, the detectives took appellant to an interview room in the homicide office. After doing some initial paper work, Detective Welch left appellant alone with Detectives Hoffmaster and Parrish. Hoffmaster testified that appellant immediately began talking about the offense. After appellant related his story one time, Hoffmaster asked him if he would mind if the detectives tape-recorded it. When appellant replied "no", a tape-recorder was obtained and appellant again ran through his story. Thereafter Hoffmaster asked appellant if he would sign a written statement. When appellant replied affirmatively, Hoffmaster had appellant tell his story again and Hoffmaster typed it in statement form. The written statement introduced into evidence is dated Friday, February 11, 1983, and the time is noted at 8:25 p.m. The statement also indicates that the witnesses signed it at 8:58 p.m., indicating that the whole interrogation and confession session in the homicide office concluded little more than an hour after appellant was "magistrized" and little more than two hours after appellant was arrested.

All the detectives testified that at no time did appellant ask to use the phone, ask to see a lawyer, or indicate in any way that he did not want to talk to them. Each detective testified that no promises were made to appellant, no force or coercion was used and appellant was allowed to use the restroom and smoke, although at one point Detective Welch, not knowing that Detective Hoffmaster had given appellant permission to smoke, told appellant not to smoke because it aggravated his bronchial condition. When Welch learned that Hoffmaster had told appellant he could smoke,

Welch left the room and appellant was allowed to smoke.

Appellant testified at the hearing on the motion to suppress that after the detectives initially read the *Miranda* warnings to him he told them he had nothing to say. He also testified that during the trip to the police station, every time the detectives asked him a question he told them he had nothing to say. At one point appellant told the detectives that he had nothing to say to them but he would do his talking to the judge. Appellant admitted that he tried to discuss the offense with the magistrate as she was giving him his *Miranda* warnings. Appellant also testified on direct examination that when he was taken into the interview room at the homicide office, he put a cigarette into his mouth but Detective Welch slapped the cigarette out of his mouth. On cross-examination, appellant testified that he understood the *Miranda* warnings when they were read to him, that the officers never hit him, that he was not abused physically, that he was given coffee and cokes, and that he was not threatened or coerced in any way.

At trial, Detectives Calhoun, Hoffmaster, Parish and Welch all testified that after the warnings were read to appellant, appellant remained silent and never told them that he did not want to talk to them. Appellant did not testify at trial.

On appeal appellant argues that the record shows that he invoked his right to remain silent after he was given the *Miranda* warnings. It must be noted at the outset of our discussion that where the facts adduced at a suppression hearing are in dispute, "the trial judge is the trier of the facts and can accept or reject the testimony of the witnesses, including a defendant, in determining the issues" before him or her. *McKittrick v. State*, 541 S.W.2d 177, 184 (Tex.Cr.App.1976). The record shows that at the conclusion of the hearing on the motion to suppress the judge denied the motion to suppress as to the written statement. We have reviewed the record and find that it supports the trial judge's ruling. Apparently the trial judge rejected the appellant's testimony that he had in-

deed told the officers he did not want to say anything. Rather the trial judge believed the detectives' testimony that the appellant remained silent after he had been informed of his *Miranda* rights. Thus the issue before us, as phrased by the State, "is whether mere silence on the part of the accused is sufficient to show that he invoked his Fifth Amendment privilege."

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that a person subject to custodial interrogation must be advised in clear and unequivocal language that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

> "Once warnings have been given, the subsequent procedure is clear. If the individual *indicates in any manner*, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." 384 U.S. at 473–474, 86 S.Ct. at 1627–1628 (footnote omitted) (emphasis added)

Both state and federal case law have construed the above language in *Miranda* to require some sort of *affirmative* assertion of a defendant's desire to exercise his or her right to remain silent. Federal case law from at least two circuits tells us that mere silence on the part of the defendant is not enough. See *Taylor v. Riddle*, 563 F.2d 133 (4th Cir.1977), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978) (where the defendant contended that his silence, after being given his *Miranda* warnings, signified his election to remain silent), and *Howard v. Maggio*, 540 F.2d 1280 (5th Cir.1976) (where the defendant contended his silence and crying during the interrogation compelled a finding that he wished to terminate the questioning).

■ Our review of Texas case law indicates that this exact question has never been considered before. The two cases cited by appellant in his brief, *Hearne v. State*, 534 S.W.2d 703 (Tex.Cr.App.1976) and *Faulder v. State*, 611 S.W.2d 630 (Tex. Cr.App.1979), both involve situations where the defendants indicated verbally that they were invoking their right to remain silent. Thus they are inapplicable to the instant situation. Based on the language of *Miranda v. Arizona*, supra, we find that under the facts of this case, appellant never indicated in any manner that he wished to invoke his right to remain silent and the trial court properly admitted his written statement into evidence.

In a related ground of error, appellant argues that the court erred in denying his requested instruction concerning the voluntariness of his confession. Appellant neither testified or presented any witnesses at the guilt-innocence phase of the trial. He maintains, however, that his cross-examination of Detective Welch raised the issue of voluntariness. He relies on the following testimony:

"Q. Okay, after you placed him under arrest at first you kind of read him some Miranda warnings from memory?

"A. Yes, sir.

"Q. And after he was already in the patrol car you read him the rights off of the blue card that's been introduced into evidence here?

"A. Yes, sir.

"Q. And I take it at the time you read those warning to him he didn't say anything to you?

"A. No, sir.

"Q. *Okay, and he basically invoked his right to remain silent and chose not to say anything to you at all at that stage?*

"A. *Yes, sir.*"

Appellant argues that the above testimony shows that appellant did invoke his right to remain silent and thus the issue of voluntariness was raised. Reading the entire direct and cross-examination of Detective Welch, we find that nowhere during his testimony did he ever state that the appellant ever expressed any desire to remain silent or to terminate the detective's questioning. Rather, Detective Welch testified that although appellant did not say anything immediately after his *Miranda* rights were read to him, as soon the detectives began questioning him, he answered all of their questions. This was clarified further during appellant's cross-examination of Detective Welch when the following occurred:

"Q. Okay now, when you all arrived at the car what was the first thing that you did when you arrived at the car after he was placed in the vehicle?"

"A. Detective Calhoun had him in the car. When we arrived we placed him in our car. We at that time got in the car and proceeded to the station.

"Q. Was it at this time you gave him the additional warnings?

"A. Yes, sir.

"Q. Okay, and after you gave him the additional warnings I take it he again didn't indicate he wanted to make any type of statement or anything like that?

"A. No, sir.

"Q. He just basically remained silent after you gave him his warnings?

"A. Yes, sir.

■ As we noted in the previous ground of error, the record shows that appellant gave no indication that he did not want to talk to the police officers. Mere silence does not invoke a subject's right to remain silent. We hold that the evidence adduced during the guilt-innocence phase of the trial did not raise the issue of voluntariness and the trial judge properly refused appellant's requested instruction. *Jernigan v. State*, 661 S.W.2d 936, 942 (Tex.Cr.App. 1983); *Wiley v. State*, 632 S.W.2d 746, 748 (Tex.Cr.App.1982); *Williams v. State*, 622 S.W.2d 116, 119 (Tex.Cr.App.1981); *Brooks*

*v. State,* 567 S.W.2d 2, 3 (Tex.Cr.App.1978); *Myre v. State,* 545 S.W.2d 820, 825 (Tex.Cr. App.1977). Appellant's seventh ground of error is overruled.

In his eighth ground of error, appellant argues that reversible error occurred during the closing arguments on punishment when the prosecutor argued, "There is always the possibility that there might be a jail break."

We find it helpful to read the entire context in which the complained of argument was made. The pertinent part of the prosecutor's argument is set out below:

"Special issue two. The Defense, again—all I can do is speculate that they might use the old argument if a defendant is in the pen he is not going to be any threat to society. Well, I think that it would be obvious to you the kind of life from the evidence that this defendant lives. He is not particularly guided by the laws that the rest of us live by. Essentially, from what he said in his confession and the other evidence that you have, he is essentially guided by instant gratification. Just whatever he wants to do at the time is what he does. It does show some planning by way of his confession by going in and killing Ms. Delaney but he essentially does whatever strikes him, I think is clear from the evidence. The same would hold true of people surrounding him in the penitentiary. If, in fact, he wanted something or whatever I think from the evidence there is not any question he would do whatever he wanted to if he thought he could get it. In this case, of course, he took advantage of a lady who was sixty-seven or sixty-eight years old and killed her to get what he wanted but that situation could relate to anyone in the penitentiary. Those persons have rights too. *There is always the possibility that there might be a jail break.*

"MR. O'BRIEN: Your Honor, I object to that as calling for some future acts of misconduct which is not supported by any evidence.

"THE COURT: Overruled.

"MR. HENDERSON: And if that were to happen and this defendant were back in society the society, that is out of the penitentiary, do you think from the evidence that you heard that his conscience and his thought process is going to keep him from doing whatever he feels he wants to do at the time? I suggest the evidence does not show that. He is going to do whatever he wants to do that he thinks he can get by with."

▉ Clearly at this point in his argument the prosecutor was arguing that the jury should answer the second punishment issue affirmatively. As a part of this argument he was urging the jury to consider not only the threat appellant might be to the society in prison but also the threat appellant would be to the free world if he ever got out of prison. In *Carter v. State,* 614 S.W.2d 821, 823 (Tex.Cr.App.1981), this Court found that even though an argument might be outside the record, if it was based on common knowledge, no reversible error was present.

"... Likewise, an argument, although outside the record, may be based upon matters of common knowledge. *Salinas v. State,* Tex.Cr.App., 542 S.W.2d 864 (fact that being an informer is a hazardous profession); *Ramirez v. State,* 163 Tex.Cr.R. 491, 293 S.W.2d 653 (fact that some marihuana finds its way into the possession of high school children); *Banks v. State,* 89 Tex.Cr.R. 438, 230 S.W. 994 (fact that whiskey is an intoxicating liquor); *Borrer v. State,* 83 Tex. Cr.R. 198, 204 S.W. 1003 (fact that a bullet is deflected from a straight course by striking an object)." 614 S.W.2d at 823.

We find no error in the prosecutor's argument.

In his final ground of error, appellant complains of the following jury argument by the prosecutor:

"... We brought you all the evidence the law allows us to bring to you."

**38**

Defense counsel's objection was immediately sustained. Counsel did not request an instruction to disregard but did make a motion for mistrial. This motion was overruled by the trial court.

 This Court in the past has found such argument to be improper because it invited the jury to speculate that there was other evidence detrimental to the defendant which the jury had not heard. If the appellant's objection to the instant argument had been overruled, we would be compelled to reverse the case. *Berryhill v. State,* 501 S.W.2d 86 (Tex.Cr.App.1973); *Stearn v. State,* 487 S.W.2d 734 (Tex.Cr.App.1972). However, where the appellant's objection is sustained, reversal is not automatically in order and an instruction to disregard this type of argument has usually been found sufficient to cure any error. *Anderson v. State,* 633 S.W.2d 851 (Tex.Cr.App.1982); *Little v. State,* 567 S.W.2d 502 (Tex.Cr. App.1978); *Lafoon v. State,* 543 S.W.2d 617 (Tex.Cr.App.1976); *Brown v. State,* 505 S.W.2d 850 (Tex.Cr.App.1974); *Magee v. State,* 504 S.W.2d 849 (Tex.Cr.App.1974); *Morgan v. State,* 502 S.W.2d 695 (Tex.Cr. App.1973); *Linzy v. State,* 478 S.W.2d 950 (Tex.Cr.App.1972).

 The proper method of pursuing an objection until an adverse ruling is to (1) object, (2) request an instruction to disregard, and (3) move for a mistrial. *Koller v. State,* 518 S.W.2d 373 (Tex.Cr.App.1975); *Brooks v. State,* 642 S.W.2d 791 (Tex.Cr. App.1982). Appellant did not ask for an instruction to disregard. Unless an argument is so inflammatory that its prejudicial effect could not have been alleviated by an instruction to disregard, the failure to request such an instruction waives the error. *Parr v. State,* 606 S.W.2d 928 (Tex.Cr.App. 1980).

We find in the instant case that the above argument did not have such a devastatingly prejudicial effect, especially when immediately after appellant's motion for mistrial was overruled, the prosecutor resumed his argument by saying, "We brought you all the evidence we had at our disposal." We find no reversible error.

Appellant's ninth ground of error is overruled.

The judgment is affirmed.

CLINTON, J., dissents.