

# NUMBER 13-21-00106-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

DANIEL MENDOZA,                                                           Appellant,

v.

THE STATE OF TEXAS,                                                       Appellee.

## On appeal from the 24th District Court
## of Goliad County, Texas.

# MEMORANDUM OPINION

### Before Justices Longoria, Hinojosa, and Silva
### Memorandum Opinion by Justice Longoria

Appellant Daniel Mendoza was found guilty by a jury for committing the offenses of murder (Count I), aggravated assault with a deadly weapon (Count II), and child endangerment (Count III). *See* TEX. PENAL CODE ANN. §§ 19.02, 22.02, 22.041. Mendoza was sentenced by the jury to ninety-nine years' imprisonment for Count I, twenty years' imprisonment for Count II, and two years' imprisonment for Count III, to be served

concurrently in the Correctional Institutions Division of the Texas Department of Criminal Justice. By one issue, Mendoza argues that his trial counsel was ineffective for failing to present evidence of insanity caused by voluntary intoxication at the punishment phase of his trial. We affirm.

## I. BACKGROUND

### A. Indictment

Count I of the indictment alleged that Mendoza committed the murder of Nathan Cortinas, Mendoza's cousin, by shooting Cortinas with a firearm. Count II alleged that Mendoza committed aggravated assault with a deadly weapon by shooting Brianna Bexley, Cortinas' girlfriend, with a firearm. Count III alleged that Mendoza committed the offense of child endangerment by shooting a firearm into a vehicle occupied by Z.C.[1], the child of Cortinas and Bexley. At Mendoza's trial, the State presented numerous witnesses demonstrating a sequence of events which culminated in two shootings: (1) a drive-by shooting at the trailer home of Cortinas and (2) a subsequent shooting at the home of April Beveridge, which served as the basis of the indicted offenses.

### B. Guilt-Innocence

Beveridge testified that on June 10, 2019, she allowed Mendoza to stay in the guest bedroom of her home in Goliad, Texas. On June 12, 2019, Beveridge observed Mendoza, Jose Hernandez, Gilberto Barrientos, and Cory Gutierrez break into Robert Garcia's home and steal a shotgun, rifle, and revolver. The firearms were initially taken

---

[1] We use initials to protect the name of the minor. *See Salazar v. State*, 562 S.W.3d 61, 63 n.1 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.) (noting that the comment to Texas Rule of Appellate Procedure 9.8 does "not limit an appellate court's authority to disguise parties' identities in appropriate circumstances . . .").

2

to Beveridge's house. Beveridge later observed Mendoza, Hernandez, Barrientos, and Gutierrez leave her home in a silver four-door sedan with the shotgun and rifle.

Beveridge further testified on June 13, 2019, she, Jade Culpepper, Mendoza, Hernandez, Barrientos, and Gutierrez smoked methamphetamine together and discussed Cortinas. Mendoza said, "[Cortinas] thinks he's about that life; he's not about that life. I'm about that life." Beveridge clarified that Mendoza meant "a gang-related life." Mendoza asked for someone to call Cortinas, and Mendoza said, "I[ a]m going to murder him." Culpepper offered to call Cortinas because they used to be in a relationship, and she was going to call Cortinas asking him to take her to Whataburger. Beveridge asked Mendoza if he had murdered anyone before, and he replied, "No, this would be my first." Beveridge stated Culpepper called Cortinas but Beveridge did not hear the conversation because Culpepper went outside to make the call. At about 11:00 p.m., Beveridge observed Mendoza with a revolver, standing on the front porch near the open garage door of her home. After she went to bed, Beveridge heard six consecutive gunshots from outside. Beveridge went outside to her front porch and saw Bexley's car parked behind her mailbox on the street. Beveridge saw Culpepper holding Bexley and Cortinas's three-week old son, and Bexley was on the ground and could not get up. When law enforcement arrived, Beveridge gave permission for police to search the premises.

Hernandez testified that on June 12, 2019, he, Frank Rucio, Mendoza, and Gutierrez drove to "La Bahia," "some back roads, [an] RV park," because Mendoza wanted to know where Cortinas lived. While traveling to Cortinas's residence, Mendoza sat on the front passenger seat with a shotgun. Mendoza stated that he was going to

3

shoot at Cortinas's residence. Upon arrival, Rucio parked his car about twenty yards away from Cortinas's trailer home. Once Gutierrez confirmed which trailer home Cortinas lived in, Mendoza fired the shotgun three or four times out of the sedan's window toward the trailer home. After Mendoza finished shooting, Rucio then drove away from the scene.

Hernandez further testified that the next day, June 13, 2019, he went to Beveridge's house after work. When he arrived, Mendoza was present, along with Barrientos, Beveridge, Robin Jones, and a man known as "C-Ray". Jones, C-Ray, Mendoza, and Barrientos smoked methamphetamine with a glass pipe in the kitchen. Mendoza asked Barrientos if he could borrow a revolver and Barrientos agreed. Hernandez observed Mendoza take the revolver. Sometime after, Culpepper came over. Culpepper and Mendoza moved the stolen shotgun and rifle behind a vacant house, next door to Beveridge's home. According to Hernandez, Culpepper and Mendoza were talking about Cortinas the whole night. Mendoza stated he wanted to kill Cortinas over $60, stating that he was trying to get methamphetamine from Cortinas but, he alleged, Cortinas ran off with his money and refused to give it back. Hernandez offered to pay the $60 back for Cortinas, but Mendoza replied "I don't want your $60. I want to make sure [Cortinas] don't [sic] do it to anybody else, ever again."

Hernandez testified that Mendoza told Culpepper about the drive-by shooting at Cortinas' trailer home and had asked her to call Cortinas to get Cortinas to come over to Beveridge's house. Hernandez and Mendoza were present and heard Culpepper call Cortinas as they were all outside on Beveridge's porch. When Cortinas got there, Mendoza stood in Beveridge's yard, near the street, with the revolver in his hand and

4

Hernandez was in Beveridge's garage. Hernandez heard Mendoza say, "Roll your window down," and saw Cortinas roll down the window. Hernandez saw Mendoza shoot Cortinas "about six times," stating that "[t]here was a pause like after the third bullet, and after that, [Mendoza] just let them all go." Hernandez stated that "[Mendoza] didn't say anything after he told [Cortinas] to roll down his window. [Mendoza] just shot at [Cortinas]."

Bexley testified that she, Cortinas, and their infant son, Z.C., had lived in a trailer home in Goliad, Texas. Bexley was aware that some days before the shooting[2], Mendoza had asked Cortinas to get him some drugs, and gave Cortinas $60 in exchange. However, Cortinas never gave Mendoza the drugs, nor did he return the money Mendoza paid. On the night of June 12, 2019, Cortinas, Bexley, and Z.C. were inside the trailer home when Bexley heard loud bangs. One of the trailer's windows had shattered, and Bexley was hit by two pellets but did not require medical treatment. When police arrived, Cortinas initially refused to talk to police, but he eventually told them he did not know who shot their trailer home. Bexley told police that the shooter was Mendoza because she had observed Cortinas and Mendoza texting via Snapchat, arguing about the $60. After the police had departed, Bexley observed Mendoza and Cortinas continue to text each other throughout the night. At 1:04 a.m., Bexley took a screenshot of a Snapchat message that Mendoza sent Bexley, which stated, "Hell yeah[,] b[****,] I pulled up and shot at [yo]ur house[,] and [Gutierrez] showed me where [yo]u lived[,] punk b[****] n[****.] [Yo]u ain't s[***,] and I'll do it again[.]" At 1:57 a.m., Bexley took another screenshot of a Snapchat message that Mendoza sent Bexley, which stated,

---

[2] Bexley's testimony is not clear as to which shooting she was referring to.

Then whoever dies first[,] wins n[****.] [Yo]u already how it is. And [wh]y y[ou ]all acting like he was[ no]t just texting me[.] [N]ah[.] [It i]s game on ever[y] week[;] expect it[.] I do[ no]t give no f[****.] [Yo]u better not b[e] where he at when [I] pull[] up or [yo]u might get got [a]nd do[ no]t bring up [yo]ur son [because I] do[ no]t care[.] [I a]m coming for him again real soon[,] so he better not hide behind [yo]u[.]

Bexley further testified that on the next day, June 13, 2019, she, Cortinas, and Z.C. stayed at a hotel. Sometime after 10 p.m., Bexley observed Cortinas communicate with Culpepper by phone but only heard parts of the conversation. Bexley heard Cortinas ask Culpepper whether Mendoza was at Beveridge's house, and Culpepper answered no. After he finished talking to Culpepper, Cortinas told Bexley that they were going to pick up Culpepper from Beveridge's house to get Whataburger. Cortinas drove Bexley and Z.C. to Beveridge's house. Bexley sat in the front passenger seat, and Z.C. was in a car seat in the back seat. Upon pulling up to Beveridge's house, Bexley saw Culpepper standing by the mailbox, and Mendoza was outside on Beveridge's yard, near the garage, appearing to be holding a gun. Bexley told Cortinas to drive and not stop, however, Cortinas replied that Mendoza was not going to do anything and parked in front of the mailbox of Beveridge's home. According to Bexley, Mendoza then walked towards the vehicle, and Culpepper opened the vehicle's back door. Culpepper said nothing, and Bexley told her to get the baby, but Culpepper was already getting the baby out of the car seat. When Mendoza got to the car, Cortinas said "Don't do this fool, don't do this, Bro," and Mendoza said, "Nah, f[***] you," and started shooting. After two or three shots, there was a pause, Cortinas told Bexley he loved her, and then Mendoza kept shooting.

Bexley next testified that she got out of the car and started walking towards the back of the car but fell. Bexley felt blood go down her back when she sat up. Bexley saw

6

Mendoza run towards the street, and called 9-1-1, a recording of which was admitted into evidence. During the recorded 9-1-1 call, Bexley informed the operator that she and Cortinas had been shot by Mendoza, that they were located at Beveridge's home, and that Mendoza had fled. Bexley remembered that officers arrived, and that former Goliad County Sheriff's Deputy Isaac Kimbrough carried her to the back of his car. The next thing Bexley remembered was waking up while being transported via helicopter to Brooks Army Medical Center in San Antonio, where she stayed for five days. Bexley survived, but a bullet was lodged inside her spine which could not be removed.

Kimbrough testified that on June 13, 2019, he received a call from dispatch at 11:52 p.m. that informed him two people had been shot at a location later identified as Beveridge's residence. When Kimbrough arrived at Beveridge's house, he observed Bexley sitting on the street, leaning up against the front passenger door of her vehicle. Kimbrough ordered Culpepper, Beveridge, and Bexley to take cover behind his patrol unit; Culpepper and Beveridge obliged, but Bexley explained that she could not because she had been shot. Once other deputies arrived, Kimbrough ran to Bexley and assisted her up from the ground to the back of his patrol unit. Kimbrough ran back to Bexley's vehicle, called Cortinas's name, and received no response. Kimbrough observed Cortinas in the driver's seat, hunched over with blood dripping from his head, and noticed the driver's side window was open. Cortinas was later pronounced dead at the scene.

Kimbrough further testified that he received a second call from dispatch regarding Mendoza's location. Kimbrough arrived at a "Tiger Tote or Circle K" convenient store and saw Mendoza sitting on picnic tables. According to Kimbrough, while Mendoza was being

7

arrested,

> [Mendoza] made a statement of wanting to know what was going on, and that he had heard some stuff had went down. Once Mr. Mendoza was placed in cuffs and was being searched, incident to arrest for any weapons or anything, any kind of contraband, [Mendoza] made a statement along the lines that he had heard [Cortinas] had been shot and added in that [Cortinas] got what he deserved.

Goliad County Sheriff's Deputy Henry Guerra testified that he assisted in a search for the weapon used in the June 14, 2019 shooting. Guerra began his search where he had been informed the suspect had fled: down Franklin Street headed west. As Guerra walked down Franklin Street, he noticed two drainage culverts on the side of the ditch on the road. The first culvert was free and clear of debris. However, the second one had debris pushed up against it, and Guerra located an old long-barrel model .22 caliber revolver inside. The revolver had seven casings inside its cylinder and appeared to have been fired.

Former Goliad County Sheriff's investigator Donna Starry testified that a shotgun, rifle, and revolver retrieved by police in the backyard of a vacant house and drainage culvert matched guns that were reported stolen from Garcia's home, who lived down the street from Beveridge. In particular, Starry noted that the .22 revolver was an Iver Johnson target model 57A. The revolver had a maximum capacity of eight shots, and only seven "shells" were found. After officers got consent to search Beveridge's home, they found a bag of .22 caliber bullets in Mendoza's bedroom. Officers also found shotgun shells that matched the same gauge or caliber as the stolen shotgun that was recovered.

Vickie Willoughby, M.D., a medical examiner, performed an autopsy on Cortinas and determined that his cause of death was gunshot wounds. The autopsy revealed that

8

Cortinas was shot eight times, but only four projectiles were recovered. Willoughby identified two gunshot wounds, with entry points to the left side of Cortinas's head, as the most lethal of all his injuries.

The jury returned a guilty verdict on all counts.

**C.     Punishment**

During the punishment phase of Mendoza's trial, the State presented two witnesses and Mendoza presented one witness—Tony Hernandez, his mother. Tony testified, in relevant part, that she had visited Mendoza in jail two days after Cortinas's murder, and "[Mendoza] was so drugged out that he asked me who [Cortinas] was, that he wanted me to show him a picture of who [Cortinas] was because he did[ no]t know what or who he had done—what he had done." Tony further testified that Mendoza denied murdering anyone at all. During cross-examination, the following colloquy occurred:

| [The State]: | Do you think [Mendoza] was telling you the truth when he told you he didn't know who he murdered? |
|---|---|
| [Tony]: | I think he was really disoriented. |
| [The State]: | Why do you think he was disoriented? |
| [Tony]: | While he was talking to me, he was pulling out his teeth. They were chipping. That's how bad drugs he was on. |

Following sentencing, Mendoza timely filed a motion for new trial, solely alleging that the verdicts rendered in Count I, Count II, and Count III were "contrary to the law and the evidence." The motion was overruled by operation of law. *See* TEX. R. APP. P. 21.8(a) ("The court must rule on a motion for new trial within 75 days after imposing or suspending sentence in open court.").

9

This appeal followed.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Standard of Review and Applicable Law

To obtain a reversal of a conviction for ineffective assistance of counsel, "a defendant must show that: (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding." *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Deficient performance means that 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Ex parte Napper*, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 687). The prejudice prong requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 248 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694). "[E]ach case must be judged on its own unique facts." *Davis*, 278 S.W.3d at 353.

The burden is on appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). "The defendant must overcome 'the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance' and that the conduct constituted sound trial strategy." *Johnson v. State*, 624 S.W.3d 579, 586 (Tex. Crim. App.

2021) (citing *Thompson*, 9 S.W.3d at 813). A reviewing court will not second-guess legitimate tactical decisions made by trial counsel. *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008) (noting that, "unless there is a record sufficient to demonstrate that counsel's conduct was not the product of a strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate"). Counsel's effectiveness is judged by the totality of the representation, not by isolated acts or omissions. *Thompson*, 9 S.W.3d at 813. However, "it is possible that a single egregious error of omission or commission by [defense] counsel [can] constitute[] ineffective assistance." *Id.* (cleaned up).

In the majority of instances, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel. *Jackson v. State,* 973 S.W.2d 954, 957 (Tex. Crim. App.1998). Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Johnson*, 624 S.W.3d at 586. A silent record that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *Id*. In the case of such a silent record, "the challenged conduct must be 'so outrageous that no competent attorney would have engaged in it.'" *Roberts v. State*, 220 S.W.3d 521, 533–34 (Tex. Crim. App. 2007) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).

Under the Texas Penal Code, "[v]oluntary intoxication does not constitute a defense to the commission of a crime," but "[e]vidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the

11

offense." TEX. PENAL CODE ANN. § 8.04(a), (b). Whether an appellant was entitled to a mitigation instruction under § 8.04(b) depends upon whether the issue is raised by the evidence. *See Johnson v. State*, 452 S.W.3d 398, 407 (Tex. App.—Amarillo 2014, pet. ref.) (citing *Arabie v. State*, 421 S.W.3d 111, 114 (Tex. App.—Waco, 2013, pet. ref'd) (citing *San Miguel v. State*, 864 S.W.2d 493, 495–96 (Tex. Crim. App. 1993))). In order to raise the issue of temporary insanity by intoxication, the evidence must tend to show both that appellant was intoxicated and that "[appellant]'s voluntary intoxication caused him (1) not to know his conduct was wrong or (2) it caused him to be incapable of conforming his conduct to the requirements of the law he violated." *Cordova v. State*, 733 S.W.2d 175, 190 (Tex. Crim. App. 1987) (en banc); *see* TEX. PENAL CODE ANN. §§ 8.01(a), 8.04. Evidence of intoxication, "even gross intoxication," is not sufficient to require a mitigating instruction. *Arnold v. State*, 742 S.W.2d 10, 14 (Tex. Crim. App. 1987); *see Cordova*, 733 S.W.2d at 190. Furthermore, "[i]t is well settled that lack of memory is not the same thing as intoxication; thus, evidence showing loss of memory is not sufficient to require an instruction on temporary insanity." *Reyna v. State*, 11 S.W.3d 401, 403 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (citing *Hart v. State*, 537 S.W.2d 21, 23–24 (Tex. Crim. App. 1976)); *see also Howard v. State*, 239 S.W.3d 359, 365 (Tex. App.—San Antonio 2007, pet. ref'd.). "Evidence showing the defendant was intoxicated and nothing more does not justify submission of an issue on temporary insanity, and refusal to submit such charge in mitigation of punishment is not error." *Arnold*, 742 S.W.2d at 14 (citing *Sawyers v. State*, 724 S.W.2d 24 (Tex. Crim. App. 1986)).

**B.     Discussion**

In his sole issue, Mendoza argues that his counsel was ineffective and he was prejudiced during the punishment phase of this trial because his trial counsel failed to investigate and present evidence of insanity caused by voluntary intoxication. In arguing this claim, Mendoza relies on Tony's testimony regarding his behavior and statements made while he was in jail two days after Cortinas's murder, as well as the testimony that Mendoza smoked methamphetamine at Beveridge's house the day he shot Cortinas. Mendoza claims that trial counsel should have been aware of his state of mind during the shooting of Cortinas. Mendoza further argues that his trial counsel was deficient for failing to have mental health experts appointed that could have corroborated Tony's testimony and provided a medical perspective of the effects of Mendoza's "heavy methamphetamine use on his brain and how this affected [his] decisions at the time of the offense." Finally, Mendoza maintains that had an expert examination been requested by his trial counsel prior to trial, the outcome could have been different than the jury's decision "of a top-end sentence of 99 years in prison" and that such expert testimony "would have only benefitted [his] case at punishment."

A claim for ineffective assistance based on trial counsel's failure to investigate the facts of the case fails absent a showing of what the investigation would have revealed that reasonably could have changed the result of the case. *See Cooks v. State*, 240 S.W.3d 906, 912 (Tex. Crim. App. 2007); *Stokes v. State*, 298 S.W.3d 428, 432 (Tex. App.—Houston [14th] 2009, no pet.). In this case, the record demonstrates that

13

Mendoza's trial counsel filed a sealed[3] motion requesting the appointment of a psychiatrist or psychologist for purposes of evaluating Mendoza's sanity at the time of commission of the offenses involved in this case. The trial court granted said request. Thus, the record establishes that Mendoza's trial counsel did not fail to request the appointment of an expert to evaluate Mendoza's sanity at the time of the offenses.

The record only contains a competency evaluation[4] that was performed by a licensed psychologist after the trial court granted Mendoza's request, and not an evaluation of Mendoza's sanity at the time of the commission of the offenses. None of the evidence in the record establishes that Mendoza's voluntary intoxication by methamphetamine caused him to not to know his conduct was wrong or be incapable of conforming his conduct to the requirements of the law he violated. *See Cordova*, 733 S.W.2d at 190. We note that multiple witnesses testified that Mendoza planned on killing Cortinas. There is simply no evidence in the record demonstrating that Mendoza was temporarily insane due to voluntary intoxication at the time he committed the offenses. *See* TEX. PENAL CODE ANN. § 8.04(a), (b). Furthermore, Mendoza does not show what further investigation would have revealed that reasonably could have changed the result of the case. *See Cooks*, 240 S.W.3d at 912; *Stokes*, 298 S.W.3d at 432. Mendoza's claim that the outcome of his case could have been different had an expert been appointed is conclusory because there is no evidence in the record establishing what an expert would have testified to, or how said testimony would have been beneficial to Mendoza's case.

---

[3] This motion was ordered unsealed by the trial court for purposes of this appeal.

[4] This competency evaluation concluded that Mendoza was competent to stand trial.

14

The record is silent as to the reasons why Mendoza's trial counsel did not further investigate whether Mendoza was temporarily insane due to voluntary intoxication at the time he committed the offenses involved in this case, and we cannot say that the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *See Roberts,* 220 S.W.3d at 533–34. Because the record does not affirmatively demonstrate the alleged ineffectiveness of Mendoza's trial counsel, Mendoza has not overcome the strong presumption that his trial counsel's conduct fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Johnson*, 624 S.W.3d at 586. Accordingly, we overrule Mendoza's sole issue.

### III. CONCLUSION

We affirm the judgment of the trial court.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
1st day of December, 2022.

15