**Opinion issued May 16, 2017.**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-15-00902-CR**

**NO. 01-15-00903-CR**

_____

**ROEL DAVID GONZALEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Case No. 1325153 & 1325154**

---

# O P I N I O N

A jury found Appellant, Roel David Gonzalez, guilty of the offense of

aggravated sexual assault of a child on the first offense and indecency with a child

on the second.[1]  Appellant elected for the jury to assess punishment, and it assessed his punishment at confinement for twenty years on the first offense and five years on the second offense, to run concurrently.  Appellant raises the following five issues: "Evidence was insufficient as a matter of law to sustain Appellant's conviction for" (1) "the offense of aggravated sexual assault of a child [and (2)] for the offense of indecency with a child"; (3) "[t]he trial court erred in denying Appellant's motion [for] mistrial for the constitutional challenge to article 39.15 of the Texas Code of Criminal Procedure;" (4) "[t]he trial court erred when it overruled Appellant's objection to the improper argument of the prosecutor injecting evidence outside the record"; and (5) "[t]he trial court erred in denying Appellant's motion for mistrial based upon the prosecutor's improper jury argument."

We affirm.

## Background

Mother testified that she met Appellant through work, began dating him, and eventually they moved into a house along with Mother's three daughters in 2008. At the time, Alice was almost twelve, Belle was ten, and Cici, the complainant,

---

[1]    *See* TEX. PENAL CODE ANN. §§ 21.11 (Vernon 2011) & 22.021 (Vernon 2016).

was age eight.[2] Appellant became the family's primary supporter because, as Belle and Cici testified, Mother contracted multiple sclerosis. They lived together happily until one night when Appellant and Mother argued and threw beer containers at each other.

According to Mother's testimony, Appellant was outside drinking with friends. After she asked them to come inside, she went outside where she and Appellant argued. Mother conceded that, after they argued, she threw a six-pack of beer at Appellant, and then he threw a twelve-pack of beer at her, cutting her forehead and cheek. Alice testified that she heard Mother go outside, and then she heard a loud boom. Alice went outside, smelled beer and blood, and saw her mother on the floor next to broken glass beer bottles with a bleeding gash on her forehead. Belle testified that, after Alice woke her, she ran outside to the garage and saw her mother bleeding and beating on Appellant's car window. Cici also saw her mother bleeding after the beer bottle incident.

Following this incident, the relationship between the girls and Appellant was strained. Mother testified that, before the beer bottle incident, the girls would greet Appellant, but afterwards, they did not want to be home with him on the weekends. Priscilla Mango and Bryanna Gonzalez, Appellant's daughters, also observed the

---

[2]      For the purpose of this appeal, we refer to the children using the pseudonyms Alice, Belle, and Cici, rather than using their initials, and their mother as Mother. *See* TEX. CODE CRIM. PROC. ANN. art. 57.02(h) (Vernon Supp. 2016).

3

change in behavior. Mango testified that the girls initially called her father "Daddy," but stopped after the beer bottle incident. Gonazalez testified that "[the girls] loved him like their own father," but became cold and distant after the incident. Also, during cross-examination, an investigator for the Texas Department of Family and Protective Services (DFPS) testified that Alice told her that she wanted Appellant out of the house and that she wanted her Mother and her biological father to reconcile. According to the investigator, Alice's dislike for Appellant increased after the beer bottle incident. The investigator also confirmed that Mother knew her daughters did not like Appellant. Belle and Cici both conceded on the stand that they did not like Appellant.

In 2009, on the night of the first incident, Belle testified that she, Cici, and Appellant were up late playing Monopoly, as they often were, and Mother had gone to sleep. Belle lost. While the game continued, she fell asleep. She testified that she woke up as Appellant tried to unzip her blue jean shorts to the light of a camouflage-colored flashlight, but she rolled over, dissuading him. She also testified that she saw Appellant move towards Cici with a flashlight, and then stand over her. Belle said that she thought Appellant did the same thing to Cici.[3]

---

[3]     Belle also testified that on another date, Appellant attempted to kiss her on the mouth, but she pulled away from him. She did not mention this during her forensic interview.

4

Cici testified that Appellant stood over her and pulled her nightgown up and underpants aside to put his mouth and tongue on her genitals. Cici defined her genitals as the part of her body she uses to go to the bathroom. Cici was scared and "didn't know what to do."

Cici further testified that, after a while, Appellant stopped, retrieved a beer from the kitchen, and came back. Appellant re-opened her legs by grabbing her ankles, and returned to licking her genitals. Cici kept her eyes shut, so that Appellant would not know she was awake.

Cici also testified that, on a second night, she awoke to Appellant unbuttoning her shorts and sticking two fingers into her vagina, which she demonstrated during trial using a Kleenex box. She was in the room where all three girls slept. Unlike the last time, Cici said it hurt her, so she opened her eyes, but she did not try to wake her sisters. Cici testified that Appellant stopped, went to the bathroom, and washed his hands.

On a third night, Cici testified that she saw Appellant enter their room, but Cici shook Alice awake. Alice questioned Appellant's presence. Also, the noise woke Mother, who asked Appellant to turn off the light. Appellant left the room.

Alice testified that she learned of the abuse from Belle and Cici in the summer of 2010, and she started a rumor at school that Appellant had raped her. She testified that the point of the rumor was to remove Appellant from the house or

5

to call attention to Appellant's wrongdoing. When confronted by a school counselor, Alice conceded that she lied when she said that Appellant raped her. The DFPS investigator testified that she received a report about suspected abuse in April of 2011, and that both Belle and Cici told her about the sexual abuse.

All three girls were transported to, and participated in, forensic interviews at the Children's Assessment Center. Stephanie Jones, the forensic interviewer, testified that Cici was 10 years old at the time of the interview and made the comment "my stepfather raped me."

The State provided *Brady* notices for the forensic interviews to Appellant. Prior to and during trial, Appellant moved for copies of the forensic interviews in order to fully prepare his defense. The trial court allowed access to the interviews, but did not allow Appellant to copy the interviews. Both Appellant's counsel and expert reviewed all three videos prior to trial. Appellant also asked for a mistrial on the basis that the lack of copies hindered his right to prepare and confront witnesses, and the trial court denied the mistrial request. During its rebuttal case, the State called the forensic interviewer, and, after Appellant waived his objections, all three interviews were admitted by the trial court and published to the jury.

During his cross-examination of the girls, Appellant highlighted inconsistencies between their testimony on the stand and their forensic interviews.

Belle conceded on the stand that in the forensic interview she did not mention the flashlight, did not remember telling Cici to go to her room, did not see Appellant get a beer after the initial abuse of Cici, and did not see Appellant go back and touch Cici again. Cici testified that she did not remember Appellant using a flashlight, and still did not remember the flashlight after reviewing her forensic interview testimony in which she said she woke up to a bright light. Cici did not tell the forensic interviewer about Appellant's massaging her feet before she fell asleep

Appellant, on appeal, calls our attention to discrepancies between Belle and Cici's testimony: Cici did not remember falling asleep on the couch, nor did she remember anyone else being awake, even though Belle had testified to being awake. Also, Belle said the girls did not wear shorts around Appellant, but Cici said she was wearing shorts during the second assault.

Concerning the third night, Appellant also points out on appeal that Cici testified in the forensic interview that her older sister, Alice, was at her grandmother's house, not at home, as she testified at trial.

Dr. Reena Isaac, a child abuse pediatrician and the medical director of the forensic nurse team at Texas Children's Hospital, conducted the medical examinations for the DFPS investigation, and specifically of Cici. Isaac testified that Cici told her that Appellant touched "in my private parts" and pointed to her

7

genitals. Isaac related that Cici said Appellant touched her genitals with his mouth and his fingers two times, but Cici never saw Appellant's private part. Isaac further testified that she found no damage in Cici's genital area, which was expected because any damage could have repaired itself within days. On cross-examination, Isaac conceded that, even though the exam itself is not dispositive, she did not see any physical signs of abuse.

Dr. Gilbert Garcia, a pediatrician with Northeast Pediatric Associates of Humble, testified that Cici visited his office twice in 2011. The first was a normal visit, where everything "looked fine." On a second visit for an upper respiratory infection several months later, Mother and Cici met with one of Dr. Garcia's physician's assistants. Dr. Garcia read the assistant's notes to the jury, which indicated Mother was very concerned about child abuse dating back two years, and she asked for a referral to a psychiatrist:

> Mom states that patient was sexually abused for over two years. She found out this April that her boyfriend was sexually abusing [Belle] and her sister. Mom had gone to the police and both girls had been examined by CPS physicians. The boyfriend is no longer in the picture. Mom is pressing charges. Mom is very concerned, crying in the office. She states that the girls do not talk about what happened and are very withdrawn. Mom would like for them to be seen by a psychiatrist.

Dr. Garcia testified that his office did make a referral, but Mother never updated them about any treatment CiCi was receiving.

Dr. Mathew Ferrara, a licensed psychologist and licensed sex offender treatment provider, suggested on the stand that about 42% of sexual abuse allegations are unfounded. He stated that false allegations most typically occur in older children who either have specific motives or who are coached for custody or divorce hearings by a parent. Motives may include lying to protect a parent from being hurt by another. Ultimately, he asserted that contradictions in the testimony of children are the key to identifying whether a statement is false. Dr. Ferrara suggested that if one child says she saw someone touching another's genitals with his fingers, but another child felt or saw the offender touching her genitals with his mouth, that would be a major contradiction.

Dr. Ferrara also confirmed, on cross-examination, a few basic truths about child sexual abuse: victims and offenders usually know one another; offenders can have active sexual relationships with their spouses while committing sexual offenses with children; and intoxication could encourage an offender.

Appellant provided three character witnesses: his ex-wife, a relative, and a neighbor. Appellant's ex-wife testified that she had known him for 30 years, and he was a good person, despite her having filed a protective order against him in the past. His ex-wife testified she filed the protective order after three death threats. First, Appellant threatened to kill his ex-wife when he caught her alone. Second, he followed his ex-wife into a neighbor's house, and told everyone that they could

neither leave nor use a phone. He, then, shoved her into a wall, while grabbing and squeezing her wrists, saying that if he hit her, she would not get up. Third, he grabbed her arm while she was leaving work and threatened to kill her because he said that she was having a relationship with another man.

Enedelia Pina, who identified Appellant as her husband's nephew, testified that she knew Appellant, and knew he was a peaceful and law abiding citizen. Michael Santos, Appellant's neighbor since 1977 and a sergeant with the Harris County Sheriff's Office, testified that Appellant was a peaceful, law-abiding citizen and a good neighbor. Both Pina and Santos were aware of the beer bottle incident, but it did not change their opinion of Appellant.

In June 2012, the State indicted Appellant for the offenses of aggravated sexual assault of and indecency with Cici, a child under the age of fourteen. The indictments for aggravated sexual assault and indecency with a child alleged, respectively:

> The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, ROEL DAVID GONZALEZ, hereafter styled the Defendant, heretofore on or about JANUARY 1, 2009, did then and there unlawfully, intentionally and knowingly cause the sexual organ of [Cici], a person younger than fourteen years of age, to contact the MOUTH of THE DEFENDANT.
>
> The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, ROEL DAVID GONZALEZ, hereafter styled the Defendant, heretofore on or about JANUARY 30, 2009, did then and there

10

unlawfully, intentionally and knowingly cause the penetration of the SEXUAL ORGAN of [Cici], hereinafter called the Complainant, a person younger than fourteen years of age, by placing HIS FINGER in the SEXUAL ORGAN of the Complainant.

Later, in closing argument, both Appellant and the State revisited the night when Appellant struck Mother on the head with a beer bottle. In his closing argument in the guilt phase, Appellant suggested that the girls had lied about the sexual abuse in order to protect their Mother from Appellant. During the punishment phase, after recounting Appellant's mistreatment of his ex-wife, the State suggested he continued the same pattern of behavior with Mother because Appellant "bash[ed] her head in with a beer bottle." Appellant objected that the State's statement was outside the evidence because the bottle was "thrown." The trial court overruled the objection and instructed the jury to rely on testimony as evidence.

Also in closing argument for the punishment phase, Appellant and the State also discussed what impact the length of jury deliberation should have on Appellant's punishment. Appellant suggested that the jurors could use any residual doubts they had when they considered Appellant's punishment. The State responded in their argument "Don't let anyone tell you or make you feel bad about your verdict. That's not right." Appellant objected. The trial court sustained the objection and instructed the jury to disregard the last comment. Appellant then asked for, but the trial court denied, a request for mistrial.

11

The jury found Appellant guilty of aggravated sexual assault of and indecency with a child and assessed punishment at twenty years' confinement on the first offense and five years' confinement on the second offense. The trial court entered judgment on the jury's verdict and punishment sentence. Appellant now brings this appeal.

## Sufficiency of the Evidence

In his first and second issues, Appellant argues that the evidence is insufficient to support the offense of aggravated sexual assault of a child or of indecency with a child because enough factual inconsistencies proliferate the record to prevent a rationale juror from finding Appellant guilty beyond a reasonable doubt. Appellant contends that the children were motivated by anger, after Appellant bloodied their mother with a beer bottle. The State asserts that Appellant is asking this Court to re-weigh the evidence, which is the jury's responsibility. Instead, the State argues that the children's testimony combined with the forensic interview videos and medical records was sufficient for the jury to find Appellant placed his mouth on Cici's sexual organ and two fingers into Cici's sexual organ while she was younger than fourteen years of age.

In evaluating the sufficiency of the evidence, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a

reasonable doubt.  *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (*citing Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd); *but see Johnson v. State*, 419 S.W.3d 665, 671 n.2 (Tex.App.—Houston [1st Dist.] 2013, pet. ref'd) (suggesting the Court of Criminal appeals should revisit whether legal and factual sufficiency standards of review are indistinguishable).  Evidence is legally insufficient when the "only proper verdict" is acquittal.  *Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2218 (1982).  We examine sufficiency under the direction of *Brooks*, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19, 99 S. Ct. at 2788–89).  We defer to the fact finder's resolution of conflicting evidence unless the resolution is not rational.  *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given the witness's testimony.  *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981); *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).  And, they may choose to believe or disbelieve any part of a witness's testimony.  *See Davis v.*

*State*, 177 S.W.3d 355, 358 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Likewise, "reconciliation of conflicts in the evidence is within the exclusive province of the jury." *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000) (citing *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986)).

A person commits the offense of aggravated sexual assault of a child if the person intentionally or knowingly causes the penetration of the anus or sexual organ of a child by any means, and the victim is under the age of fourteen. *See* TEX. PENAL CODE ANN. § 22.021 (a) (1) (B) (i), (2) (B) (Vernon Supp. 2016). The uncorroborated testimony of a child victim is alone sufficient to support a conviction of aggravated sexual assault of the child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07 (Vernon Supp. 2016) (providing that if victim is age seventeen or younger, requirement that victim inform another person of alleged offense within one year does not apply); *Johnson*, 419 S.W.3d at 671–72.

A person commits the offense of indecency with a child if, among other things, he touches the breast or genitals of someone younger than 17 years of age with the intent to arouse or gratify the sexual desire of anyone. TEX. PENAL CODE ANN. § 21.11(a)(1), (c)(1). Touching a child through her clothing is encompassed by the offense. § 21.11(c)(1). The required intent may be inferred from the surrounding circumstances. *Navarro v. State*, 241 S.W.3d 77, 79 (Tex. App.– Houston [1st Dist.] 2007, pet. ref'd). The uncorroborated testimony of either the

child or an outcry witness suffices to support a conviction for indecency with a child. *Jones v. State*, 428 S.W.3d 163, 169 (Tex. App.–Houston [1st Dist.] 2014, no pet.).

Here, Cici was nine years old at the time of the offenses. Cici testified that Appellant pulled her underpants aside to put his mouth and tongue on her genitals. Cici defined her genitals as the part of her body she uses to go to the bathroom. Belle testified that on the same night, Appellant tried to unzip her shorts, but she rolled over, dissuading him. Belle testified that she also saw Appellant move towards Cici with a flashlight, and then stand over her.

Cici testified that another night, she awoke to Appellant unbuttoning her shorts and sticking two fingers into her vagina, which she demonstrated during trial using a Kleenex box. Cici's testimony that Appellant placed his mouth on and finger inside her vagina is alone sufficient to support Appellant's convictions for aggravated sexual assault of and indecency with a child. *See* Tex. Code Crim. Proc. Ann. art. 38.07; *Jones* 428 S.W.3d at 169; *Johnson*, 419 S.W.3d at 671–72.

Viewing the evidence in the light most favorable to the jury's verdict, as we must, we conclude that a rational trier of fact could have found that Appellant committed the offense of aggravated sexual assault of and indecency with a child, and we defer to that finding. The jury could resolve any contradictions between the girls' live testimony and earlier forensic interviews in favor of the girls'

15

account. *See Wyatt*, 23 S.W.3d at 30. Accordingly, we hold that the evidence is sufficient to support Appellant's conviction for aggravated sexual assault of and indecency with a child.

We overrule Appellant's issues error one and two.

## Constitutionality of Article 39.15

In issue three, Appellant asserts "[t]he trial court erred in denying Appellant's motion [for] mistrial for the constitutional challenge to article 39.15 of the Texas Code of Criminal Procedure." Appellant argues that his limited access to the girls' forensic interviews under of the Texas Code of Criminal Procedure interfered with his counsel's and his expert's preparations, and he was unable to confront the child witnesses as allowed by the Confrontation Clause and Article I Section 10 of the Texas Constitution. *See* U.S. CONST. amends. VI, XIV; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 39.15 (Vernon Supp. 2016). Appellant asserts he should have been given copies of the videos, not access to them. The State argues that Article 39.15 is constitutional because Appellant was able to view the forensic interviews and use the information within them against the girls when they testified in the trial court. We must, therefore, determine whether the records were made reasonably available to Appellant, satisfying the statutory requirements, and then whether the statute violates the Confrontation Clause.

## A.   Reasonable Availability of Forensic Records under Article 39.15

Article 39.15 of the Texas Code of Criminal Procedure provides that a court should make a child victim's forensic interviews reasonably available for inspection, but should not allow the defendant's team to copy them:

> (a) In the manner provided by this article, a court shall allow discovery under Article 39.14 of property or material:
> . . . .
> (3) that is described by Section 2 or 5, Article 38.071, of this code.
> (b) Property or material described by Subsection (a) must remain in the care, custody, or control of the court or the state as provided by Article 38.45.
> (c) A court shall deny any request by a defendant to copy, photograph, duplicate, or otherwise reproduce any property or material described by Subsection (a), provided that the state makes the property or material reasonably available to the defendant.
> (d) For purposes of Subsection (c), property or material is considered to be reasonably available to the defendant if, at a facility under the control of the state, the state provides ample opportunity for the inspection, viewing, and examination of the property or material by the defendant, the defendant's attorney, and any individual the defendant seeks to qualify to provide expert testimony at trial.

TEX. CODE CRIM. PROC. ANN. arts. 39.15 & 38.071 (Vernon Supp. 2016).

The State provided *Brady* notices for the forensic interviews to Appellant. *See Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). Accordingly, three times prior to trial, Appellant filed motions requesting production of the forensic interviews of Belle and Cici, which the State opposed because it was statutorily prevented from producing the videos:

17

1. In Texas, defendants have no general right of discovery as governed by Article 39.14 of the Texas Code of Criminal Procedure.

2. The Texas legislature amended both Article 39.15 of the Code of Criminal Procedure and § 264.408 of the Family Code to prohibit a court from ordering that videotaped interview of a child made at a child advocacy center (CAC) be copied or otherwise reproduced for a defendant, as long as it is made available to the defendant as required under Article 39.15(d) of the Code of Criminal Procedure.

*See* TEX. CODE CRIM. PROC. ANN. art. 39.15, § (c); TEX. FAM. CODE ANN. § 264.408 (Vernon Supp. 2016) ("(d-1) . . . A court shall deny any request by a defendant to copy, photograph, duplicate, or otherwise reproduce a video recording of an interview described by Subsection (d)," including child forensic videos).  The trial court partially granted the motions, allowing for access to the interviews but not to copies.

During a break in Belle's trial testimony, Appellant moved for the State to provide copies of all three forensic interviews as sealed exhibits.  He asserted that Article 39.15, as applied to his case, violated his due process and confrontation rights because any witness impeachment using the information on the tapes required that he play back part of the tape recording or a transcript.  He also asked for a mistrial because it "hinder[ed] the defendant's right to prepare and confront witnesses."  Appellant's counsel conceded to watching the forensic interview videos multiple times, including three times over the weekend before trial.  Appellant's expert also reviewed all three interviews prior to trial.  The trial court

denied the motions, but ordered the forensic interviews sealed and placed in the record for appellate purposes. Appellant proceeded to cross-examine Belle and Cici, pointing out inconsistencies between their present testimony and the forensic interviews.

During its rebuttal case, the State called the forensic interviewer, and, after Appellant waived his objections, all three interviews were admitted by the trial court and published to the jury.

Our sister courts, considering reasonable availability in the light of the Sixth Amendment, have consistently held that making available forensic interviews for defense counsel constitutes making the records reasonably available. In *In Matter of W.E.J.*, the Waco Court of Appeals held that a trial court did not abuse its discretion when it interpreted Article 39.15 to bar the creation of a translated transcript of children's forensic interviews to play before the jury. 494 S.W.3d 178, 180 (Tex. App.—Waco 2015, pet. denied). Instead, the forensic interviews were reasonably available when: "appellant's counsel viewed the video of the forensic interviews and used his own translator to transcribe and translate word for word the interviews of the child victims from Spanish to English." *See id.* Similarly, in *Flores v. State*, the videos were reasonably available when "he received full access to the video interview and did in fact inspect the video and was able to refer to specific times and statements on the video during his trial

19

questioning." No. 04-14-00915-CR, 2015 WL 5730263, at *3 (Tex. App.—San Antonio Sept. 30, 2015, pet. ref'd) (mem. op., not designated for publication). Finally, in *Loveday v. State*, the court said that having "ample opportunity to review the recording before it was shown to the jury" was reasonable availability, but rejected Appellant's request for copies of the recording or to view the recording outside a "State[-]controlled facility." No. 09-12-00240-CR, 2013 WL 5874280, at *5–6 (Tex. App.—Beaumont Oct. 30, 2013, pet. ref'd) (mem. op., not designated for publication).

One sister court has held that the right to access the videos is statutorily limited to defense counsel and an expert, and a court reporter cannot do so on behalf of a defendant. *In re Ligon*, No. 09-14-00262-CR, 2014 WL 2902324, at *1–2 (Tex. App.—Beaumont June 26, 2014, no pet.) (mem. op., per curiam, not designated for publication) (granting mandamus to prevent court reporter from transcribing child's video despite Appellant's argument that transcription is not reproduction).

Prior to trial and during trial, in the instant case, Appellant moved for copies of all three forensic interviews, but the trial court only granted access to them and did not provide copies. His counsel reviewed all three forensic interview videos, including three times over one weekend break, and used inconsistencies against

Belle and Cici during their trial testimony. Appellant's expert also reviewed the videos.

We conclude that access was reasonable under Article 39.15. However, Appellant does not argue that his access was unreasonable as defined by the statute, but that the limitation that prevented him from copying the forensic interviews was unconstitutional. *See* art. 39.15. We therefore turn to whether the limitation violated the Confrontation Clause in the Constitution of the United States and, therefore, whether Article 39.15 places an unconstitutional limitation on a defendant's access to evidence needed for cross-examination.

## B. Constitutionality of Article 39.15 as Applied Under the Confrontation Clause

The Confrontation Clause of the Sixth Amendment guarantees an accused the right "to be confronted with the witnesses against him" by having an opportunity to cross-examine the witnesses. U.S. CONST. amends. VI, XIV; *see also Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S. Ct. 1431, 1435 (1986); *Lopez v. State*, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000). While admitting that the goal of the Confrontation Clause is reliability of evidence, "[i]t commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford v. Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 1370 (2004); *see also Henley v. State*, 493 S.W.3d 77, 95 (Tex. Crim. App. 2016) (summarizing the interaction of the Confrontation Clause

21

and the Texas Rules of Evidence) (upholding *Lopez v. State*, 18 S.W.3d 220, 225 (Tex. Crim. App. 2000).[4]

"[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S. Ct. 1727, 1731 (2006). Also, "[t]he trial court maintains broad discretion to impose reasonable limits on cross-examination to avoid harassment, prejudice, confusion of the issues, endangering the witness, and the injection of cumulative or collateral evidence." *Henley v. State*, 493 S.W.3d at 95; TEX. R. EVID. 101(d); *Holmes*, 547 U.S. at 326, 126 S. Ct. at 1732.

The evidence rules should not, however, infringe upon defendant's ability to present a complete defense. *Holmes*, 547 U.S. at 324, 126 S. Ct. at 1731; *see Smith v. State*, 236 S.W.3d 282, 292 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *see e.g.*, *Coronado v. State*, 351 S.W.3d 315, 324–31 (Tex. Crim. App. 2011) (holding admission of child's written interrogatories in lieu of live testimony, under TEX. CODE CRIM. PROC. ANN. art. 38.071 §2, was unconstitutional); *compare with Thomas v. State*, 837 S.W.2d 106, 112–14 (Tex. Crim. App. 1992) (holding in camera review by trial court to determine whether crime stoppers information

---

[4]     Parties do not contest the testimonial nature of the forensic examinations. *See Woodall v. State*, 336 S.W.3d 634, 642 (Tex. Crim. App. 2011) (holding that, in reviewing Confrontation Clause challenge, appellate courts must "first determine whether the Confrontation Clause is implicated.").

contained *Brady* information would meet the balance of defendant's constitutional rights against the State's interest in fostering law enforcement).

Appellant, argues that his inability to copy the forensic interviews prevented his counsel and expert from preparing for confrontation of the witnesses, and therefore Article 39.15 is unconstitutional. He cites *Davis v. Alaska* for the proposition that confidentiality must give way to a defendant's right to cross-examination. 415 U.S. 308, 320, 94 S. Ct. 1105, 1112 (1974).

In *Davis*, the Supreme Court of the United States faced the question of whether a defendant's rights under the Sixth Amendment's Confrontation Clause could trump a state's interest in keeping juvenile records confidential. *Id.* at 309, 94 S. Ct. at 1107. The Supreme Court held that, under the specific facts presented, Davis's confrontation rights would be violated if he could not show the potential bias of the juvenile witness against him. *Id.* at 319, 94 S. Ct. at 1112. Specifically where the juvenile witness, Green, was on probation for burglarizing two cabins, Green had the potential for bias when an emptied safe was found near his family's property. *Id.* at 310–11, 317–18, 94 S. Ct. at 1107–08, 1111.

The Court found Green to be "a crucial witness for the prosecution" because he testified that he saw Davis near where the safe was discovered "with something like a crowbar," and he identified Davis in a photographic lineup and at trial. The Court stated:

> Richard Green was a crucial witness for the prosecution. He testified at trial that while on an errand for his mother he confronted two men standing beside a late-model metallic blue Chevrolet, parked on a road near his family's house. The man standing at the rear of the car spoke to Green asking if Green lived nearby and if his father was home. Green offered the men help, but his offer was rejected. On his return from the errand Green again passed the two men and he saw the man with whom he had had the conversation standing at the rear of the car with 'something like a crowbar' in his hands. Green identified petitioner at the trial as the man with the 'crowbar.' The safe was discovered later that afternoon at the point, according to Green, where the Chevrolet had been parked.

*Id.* at 310, 94 S. Ct. at 1107. When he was brought in to identify the individuals on a six person photo-array, Green identified Davis "within 30 seconds to a minute." *Id.* at 309–10, 94 S. Ct. at 1107.

Before Green testified, the State sought a protective order to prevent reference to Green's juvenile record in cross-examination. *Id.* at 310, 94 S. Ct. at 1107. Davis opposed the motion because he wanted to argue that Green might have been pressured to make his identifications under the fear of possible probation revocation. *Id.* at 311, 94 S. Ct. at 1108. The trial court granted the State's motion. *Id.*

On cross-examination, "counsel for petitioner did his best to expose Green's state of mind at the time Green discovered that a stolen safe had been discovered near his home." *Id.* at 312, 94 S. Ct. at 1108. When asked whether he was worried about police suspicions, Green answered, "No," but he "did admit that it crossed his mind that the police might have thought he had something to do with the

24

crime." *Id.* The Alaskan Supreme Court affirmed Davis' conviction, suggesting that this cross-examination was sufficient to resolve any bias or motive issue. *Id.* at 314–15, 94 S. Ct. at 1109–10.

The Supreme Court of the United States did not agree that the testimony adequately developed the issue of bias. *Id.* at 318, 94 S. Ct. at 1111. It suggested that Green's bold 'No' would not have been given but for the protective order and that the police probably did question Green concerning his prior burglaries prior to Green's identification of Davis. *Id.* at 314, 94 S. Ct. at 1109. "While counsel was permitted to ask Green whether he was biased, counsel was unable to make a record from which to argue why Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *Id.* at 318, 94 S. Ct. at 1111. The jury might have thought the inquiry was a "baseless line of attack" on a "blameless witness" or repetitive cross-examination. *Id.* Therefore, the jury needed access to the protected facts to draw "inferences relating to the reliability of the witness." *Id.*

Thus, the Court held that the State's interest in protecting the anonymity of juvenile offenders was outweighed by Davis' right of cross-examination, stating,

> Whatever temporary embarrassment might result to Green or his family by disclosure of his juvenile record—if the prosecution insisted on using him to make its case—is outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness.

*Id.* at 319, 94 S. Ct. at 1112.

While the Texas Court of Criminal Appeals has addressed the *Davis* holding in earlier cases, in *Carmona v. State*, it sought to clarify that *Davis*'s holding was limited by its facts. 698 S.W.2d 100, 104 (Tex. Crim. App. 1985). "The opinion in Davis is replete with references to 'on the facts of this case,' 'in this setting,' and other such references." *Id.* *Davis*'s holding is distinguishable from other cases in which cross-examination occurred because in *Davis* "the defendant was completely deprived of the opportunity to develop his theory of the witness' bias or motive for testifying." *Id.* The Court of Criminal Appeals held in *Carmona* that *Davis* was not a per se rule mandating the reversal of a conviction limiting cross-examination into juvenile offenses, but a rationale that criminal defendants be allowed an effective cross-examination. *Id.* at 103–04.

The Court also distinguished *Davis* because "the bias and prejudice of the witness [was] so patently obvious" in *Carmona*. *Id.* at 105. The cross-examination of the juvenile witness, Garcia, took over a day and a half by four defense attorneys. *Id.* His testimony revealed that he received "great leniency" and a grant of immunity from the State in exchange for favorable testimony; a "chilling picture" of drug and alcohol abuse along with prior crimes since the age of four; and to a prior aggravated perjury before a Travis County grand jury, to which he was not immune. *Id.* In that case, the defendant, along with Garcia and

other co-defendants, were accused of abducting, raping, and killing a woman. *Id.* at 102. "In sum, Garcia's testimony vividly portrayed the life of a habitual juvenile miscreant." *Id.* at 104. Thus, the *Carmona* court held that a trial court can prohibit questions about an unrelated pending charge when the defendant has otherwise been afforded an effective cross-examination and the bias and prejudice of the witness is patently obvious. *Id.* at 104–05.

The Court of Criminal Appeals again clarified *Davis* in *Irby v. State* to mean that a defendant must show the logical connection between the witnesses' testimony and the witnesses' probationary status. 327 S.W.3d 138, 146, 154 (Tex. Crim. App. 2010). In *Irby*, Irby wanted to cross-examine the testifying complainant, W.P., about the fact the W.P. was on deferred-adjudication probation for aggravated assault with a deadly weapon to show bias and motive, but the trial court did not allow the impeachment. *Id.* at 140. Irby was charged with sexual assault of the minor W.P. *Id.* Specifically, Irby cited *Davis* and "explained that, on the day that W.P. told the police about the sexual encounters, W.P. believed that he could get into trouble because William had planned to rob [Irby]" to retrieve W.P.'s money. *Id.* at 142, 153. The trial court disallowed the proposed cross-examination because it held the probation and sexual assault matters were completely separate. *Id.* at 140. The Dallas Court of Appeals upheld the trial court's ruling. *Id.* at 144–45. The Court of Criminal Appeals agreed with the trial

27

court's holding that the defendant failed to show the logical connection between the complainant's testimony and the complainant's probationary status. *Id.* at 154. Factually, W.P. had already told other people of the sexual encounters, and the robbery had already been foiled before W.P. spoke to the police. *Id.* As the court explained, Irby "fails to suggest how William's conduct would be attributable to W.P. or how a false story of W.P.'s consensual sexual encounters would exonerate or ameliorate the conduct of either of them." *Id.*

The Court of Criminal Appeals pointed out that the Supreme Court of the United States had held that Davis should be allowed to cross-examine the juvenile witness on probation because the State could leverage the juvenile's probationary status, raising the questions of bias and motivation in the witness, but that was not always the case. *Id.* at 146. It stated,

> [Green] may have felt that the police would suspect him of the burglary both because he had a prior burglary adjudication and because the emptied safe was found on his family's property. Based upon these particular facts, [Green] had a possible motive to divert suspicion from himself to another[, such as Davis]. Further, the police might also have brought undue pressure upon [Green] to make an identification of someone—anyone—because he was in "a vulnerable relationship" by virtue of being on probation for burglary, a fact that the investigating officers may also have known and used in questioning him.

*Id.* at 146.

The Court of Criminal Appeals went on to explain that *Davis* is not "a blunderbuss," but a "rapier" allowing for admissible evidence to impeach on bias and motive, stating:

> In sum, *Davis v. Alaska* is not a blunderbuss that decimates all other evidentiary statutes, rules, and relevance requirements in matters of witness impeachment. It is a rapier that targets only a specific mode of impeachment—bias and motive—when the cross-examiner can show a logical connection between the evidence suggesting bias or motive and the witness's testimony.

*Id.* at 152. Thus, *Davis* addresses the admissibility of testimony when the questioner can show a logical connection between the testimony and the witness bias, not the access a defendant must have to impeachment evidence in general in order to prepare for cross-examination. *See Davis*, 415 U.S. at 320, 94 S. Ct. at 1112. The *Irby* Court held that *Davis* did not apply in that case because a mere showing that the witness was vulnerable to the State only through his probationary status was insufficient to show the witness harbored bias in favor of the State. *Irby*, 327 S.W.3d at 154. Thus, the trial court did not abuse its discretion in excluding the impeachment evidence because it was irrelevant. *Id.*

Like *Davis*, neither *Carmona* nor *Irby* presents the issue before us in this case—whether access to evidence without being afforded the opportunity to copy it is sufficient to allow for a defendant to prepare for cross-examination. By contrast we find that *In Matter of W.E.J.* is similar to this case. 494 S.W.3d at 178. In *In Matter of W.E.J.*, the defendant argued that *Davis* allowed for transcription of

29

children's forensic interviews under the Confrontation Clause. *Id.* at 180. The Waco Court of Appeals held, like our present case, that 39.15 did not prevent defense counsel from confronting the juvenile accusers because counsel had viewed the forensic interviews, had them translated, and cross-examined the victims about the interviews. *Id.* Therefore, the Waco Court held that Article 39.15 did not damage the defendant's "right to confront and cross-examine witnesses to the degree shown in *Davis*." *Id.* We agree with the reasoning of the Waco Court of Appeals, and we find it applicable here.

Appellant argues his limited access interfered with his trial preparation, but, unlike *Davis*, we have already shown that, in fact, his counsel was not impeded from using inconsistencies in the forensic interviews in his impeachment of the trial testimony of Belle and Cici because Article 39.15 did not prevent Appellant from confronting these juvenile accusers regarding their motivation or bias in testifying. *See generally Davis*, 415 U.S. at 320, 94 S. Ct. at 1112; *Irby,* 327 S.W.3d at 146, 154. Also, like *Carmona*, by bringing the inconsistencies in the girls' testimony and the change in the girls' behavior towards Appellant following the beer bottle incident to the jury's attention, Appellant provided the jury with sufficient evidence to assess any bias of the girls against Appellant. *Carmona*, 698 S.W.2d at 104–05. We conclude that *Davis* does not support Appellant's argument.

We conclude that Appellant has not shown that Article 39.15 denied Appellant access to information necessary to allow him to confront the juvenile witnesses. Therefore, he has not shown that Article 39.15 is unconstitutional because it denies defense attorneys the evidence they need to confront juvenile witnesses for their possible bias or motive.

We overrule his third issue.

## Improper Jury Argument

In issues four and five, Appellant argues that the trial court erred by failing to grant a mistrial in light of the State's improper jury argument.

Proper jury argument generally must occupy one of the following areas: (1) a summation of the evidence presented at trial; (2) a reasonable deduction drawn from that evidence; (3) an answer to the opposing counsel's argument; or (4) a plea for law enforcement. *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999); *Acosta v. State*, 411 S.W.3d 76, 93 (Tex.App.—Houston [1st Dist.] 2013, no pet.). In reviewing whether jury argument falls within one of these four areas, we consider the argument in light of the entire record. *Acosta,* 411 S.W.3d at 93. Even if improper, the argument does not constitute reversible error unless, in light of the record as a whole, the argument is extreme or improper, violates a mandatory statute, or injects new harmful facts about the accused into the trial

proceeding. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000); *Acosta*, 411 S.W.3d at 93.

"To preserve error in prosecutorial argument, a defendant must pursue to an adverse ruling his objections to jury argument." *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). When complaining about improper jury argument, the proper method of pursuing an objection to an adverse ruling is to (1) object, (2) request an instruction to disregard, and (3) move for a mistrial. TEX. R. APP. P. 33.1; *Sawyers v. State*, 724 S.W.2d 24, 38 (Tex. Crim. App. 1986), *overruled on other grounds by Watson v. State*, 762 S.W.2d 591, 599 (Tex. Crim. App. 1988); *Ashire v. State*, 296 S.W.3d 331, 343 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). If the objection is sustained, the failure to request an instruction for the jury to disregard forfeits appellate review of errors that could have been cured by such an instruction. *See Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004); *Ashire*, 296 S.W.3d at 343. If such an instruction could not have "cured" the objectionable event, a motion for mistrial is the only essential prerequisite to presenting the complaint on appeal. *Young*, 137 S.W.3d at 70.

Moreover, a prompt instruction to disregard ordinarily cures any harm from improper argument. *Wesbrook*, 29 S.W.3d at 115–16. And, on appeal, we generally presume the jury followed the trial court's instructions. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *See Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

## A.     Injection of Evidence Outside the Record

In issue four, Appellant asserts "[t]he trial court erred when it overruled Appellant's objection to the improper argument of the prosecutor injecting evidence outside the record."  For issue number four, Appellant asserts that the State's statement that Appellant "bashed [Mother's] head in with a beer bottle" was outside the evidence when the bottle was "thrown."  Appellant asserts that the trial court's instruction to the jury was insufficient to cure the comment.

The State contends that "bashing" is a logical inference of the evidence.  The State also asserts that both comments were invited by defense counsel's argument.  Even if the comments were harmful, the State argues Appellant's substantive rights were not affected because the harm was not severe, the trial court's jury instructions were curative, and any effect was minimal because the sentence was on the lower end of the sentencing range.

During the guilt phase of the trial, Mother conceded that she threw a six-pack of beer at Appellant, and then he threw a twelve-pack of beer at her.  Alice also testified that she heard a loud boom, and then saw her mother on the floor next to broken glass beer bottles, with a bleeding gash on her forehead, and smelling of beer and blood.

During the sentencing phase, the State argued that the jury could consider Appellant's violent history because they could consider his character. After recounting Appellant's mistreatment of his ex-wife, the State suggested he continued the same pattern of behavior with Mother because "when she starts acting up, [he] bash[ed] her head in with a beer bottle." Appellant objected, "There's no evidence he bashed her head with a beer bottle. He threw the beer bottle after she threw beer cans at him." The trial court overruled the objection with an instruction, "Okay. Overruled. The jury—what the attorneys say in closing arguments is not evidence, and the jury will rely on what the testimony was presented." The State continued with its argument that Appellant was a "violent, violent person."

On Appeal, Appellant argues that the trial court erred when it overruled Appellant's objection to the improper argument of the State because "there was no evidence that Appellant "bashed [Mother's] head in with a beer bottle." Because Appellant's objection resulted in an adverse ruling, his objection is preserved without the necessity of requesting a curative instruction or asking for a mistrial. *See* TEX. R. APP. P. 33.1; *Sawyers*, 724 S.W.2d 38; *Young*, 137 S.W.3d at 70; *Ashire*, 296 S.W.3d at 343.

The trial court, then, immediately offered a curative instruction. And on appeal, we presume the jury followed the trial court's instructions, curing any harm

from improper argument. *Thrift*, 176 S.W.3d at 224; *Wesbrook*, 29 S.W.3d at 115–16. Moreover, the Texas Penal Code does not distinguish between throwing and bashing, so while factually distinguishable, the distinction is legally meaningless—legally Appellant hit Mother with a beer bottle. *See* TEX. PENAL CODE ANN. §§ 1.07, 21.01 (Vernon Supp. 2016), 21.02 (Vernon 2016). Because we presume the jury followed the curative instruction, we must presume an error, if any, was cured.

We overrule Appellant's fourth issue.

## B. Invited Argument

In issue number five, Appellant argues, "The trial court erred in denying Appellant's motion for mistrial based upon the prosecutor's improper jury argument." Appellant asserts that the State struck over the defense counsel's shoulders against Appellant, as improper jury argument, when the State said, "Don't let anyone tell you or make you feel bad about your verdict. That's not right." For this issue, Appellant asserts that the trial court's instruction to the jury was insufficient to cure either comment.

During closing argument at the punishment phase, Appellant suggested that, because the jurors took ten hours to reach their verdicts, some jurors "had doubts about whether or not he was guilty of either of these two charges." Appellant suggested to the jury "[t]hat residual doubt that you may have had is something

you can consider in determining whether you should give him a long time in prison or a short." Later in his argument, Appellant reminded the jury to "[t]hink about the questions you had about whether or not he was guilty."

The State responded that the jury "took [] a long time to deliberate," because "[y]'all have processed days and days of testimony." The State went on to say, "Don't let anyone tell you or make you feel bad about your verdict. That's not right." But Appellant objected, and the trial court sustained the objection. Appellant requested an instruction, and the trial court instructed to the jury to disregard the last comment. Appellant then asked for, but the trial court denied, a request for mistrial. Because Appellant (1) objected, (2) requested an instruction to disregard, and (3) moved for a mistrial, he has preserved his issue for our review. *See* TEX. R. APP. P. 33.1; *Sawyers*, 724 S.W.2d 38; *Ashire*, 296 S.W.3d at 343.

The State may argue subjects that would otherwise be improper when invited to do so by the defendant's own remarks. *Acosta*, 411 S.W.3d at 93 (citing *Albiar v. State*, 739 S.W.2d 360, 362 (Tex. Crim. App. 1987)). Appellant asserted that ten hours of deliberations suggested the jury had doubts about the guilty verdict and revived those feelings within the jury to achieve a lesser punishment. Appellant invited the State's argument that the jury need not feel guilty about taking ten hours because that was part of the jury deliberation process. *See*

*Wesbrook*, 29 S.W.3d at 115; *Albiar*, 739 S.W.2d at 362; *Acosta*, 411 S.W.3d at 93. Even if the argument was not invited, the trial court sustained the objection, and at Appellant's request, immediately issued an instruction to disregard the last comment. We presume the jury follows a curative instruction. *Thrift*, 176 S.W.3d at 224; *Wesbrook*, 29 S.W.3d at 115–16.

Appellant, however, argues that the comment was extreme enough to overcome the presumption that the jury followed the instruction because the comment struck over the shoulders of counsel. Specifically, Appellant asserts, "Striking at a defendant over defense counsel's shoulders is impermissible, as it falls outside the generally permissible areas of jury argument," citing *Davis v. State*, in support. 268 S.W.3d 683, 712–13 (Tex. App.—Fort Worth 2008, pet. ref'd). Striking over counsel's shoulders involves the State calling defense counsel a liar or accusing counsel of suborning perjury. *Id.* (citing *Gomez v. State*, 704 S.W.2d 770, 772 (Tex. Crim. App. 1985)). However, claiming the defense counsel is arguing "something ridiculous" is directed at defense counsel's argument, not at defense counsel. *Id.* at 713.

Telling the jury that they shouldn't feel bad about taking a long time for a verdict is more akin to calling Appellant's argument ridiculous than calling his counsel a liar. *See id.* Because the State's comments attacked Appellant's arguments, rather than his counsel personally, the argument did not strike over his

37

shoulders. *See Acosta*, 411 S.W.3d at 93 (stating that State's comments suggesting jury not be "fooled" by defense's "good lawyering" and that argument was "just words from the defense attorney's mouth," attacked defense counsel's arguments, not defense counsel personally); *Garcia v. State*, 126 S.W.3d 921, 925 (Tex. Crim. App. 2004) (holding that State's comment that defense was "argu[ing] that hogwash that you've heard" was State's opinion of defense's arguments, not an attack on counsel's personal integrity). Because the argument did not strike over the shoulders of counsel, the conduct did not rise to a level sufficient to overcome the presumption that the jury followed the curative instruction. *Thrift*, 176 S.W.3d at 224; *Wesbrook*, 29 S.W.3d at 115–16. As the instruction was curative, we conclude the trial court did not abuse its discretion in denying the mistrial. *See Hawkins*, 135 S.W.3d at 77.

We overrule Appellant's fifth issue.

## Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Lloyd.

Publish. TEX. R. APP. P. 47.2(b).