

NUMBER 13-17-00035-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

SERGIO REYES,                                                                      Appellant,

v.

THE STATE OF TEXAS,                                                                Appellee.

**On appeal from the 331st District Court
of Travis County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Perkes
Memorandum Opinion by Justice Longoria**

Appellant Sergio Reyes was convicted for aggravated sexual assault of a child, a first-degree felony.  *See* TEX. PENAL CODE ANN. § 22.021 (West, Westlaw through 2017 1st C.S.).  By three issues, Reyes argues that:  (1) the trial court abused its discretion in admitting extraneous-offense evidence; (2) the trial court abused its discretion in failing

to grant his motion for mistrial; and (3) the evidence is legally insufficient to support his conviction. We affirm.

## I. BACKGROUND[1]

Reyes was indicted for aggravated sexual assault of a child (count one), indecency with a child by contact (count two), and indecency with a child by exposure (count three). *See id*. §§ 21.11(A)(1), (2), 22.021 (West, Westlaw through 2017 1st C.S.).

Jury trial began on December 6, 2016. At the trial, Sandy Gamez[2] testified she met Reyes in August of 2006 while they were both attending Job Corps. Gamez's daughter, P.G.,[3] who was almost two years old at the time, was staying with Gamez's aunt, Lorena Montes, in Houston. On July 9, 2007, Reyes and Gamez had a son, G.S.

In March of 2009, Reyes and Gamez were living in Houston along with G.S. and P.G. Gamez testified Montes informed her that she had video-recorded P.G., who was then approximately four years old, accusing Reyes of touching her inappropriately. According to Gamez, she never saw the video and did not believe the accusation. Gamez admitted that she frequently asked her children whether they had been sexually abused; Gamez stated that she did so out of "[t]his paranoia that [she] had . . . [b]ecause [she] was molested when [she] was little." A CPS investigation was conducted, and ultimately the accusation was ruled out because P.G. denied any allegation of abuse. On August 20, 2009, Reyes and Gamez had a daughter, M.S. Shortly after M.S.'s birth, Gamez,

---

[1] This case is before this Court on transfer from the Third Court of Appeals in Austin pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2017 1st C.S.).

[2] We note that Reyes refers to Sandy as Sandy Cortez and the State refers to Sandy as Sandy Gomez, not Gamez. We will refer to Sandy using the name Gamez because that is the name and spelling used in the clerk's record and reporter's record.

[3] To protect the identity of the children, we refer to them using aliases. *See* TEX. R. APP. P. 9.8(b).

2

Reyes, and the children moved to Georgetown to live with Reyes's father and his girlfriend. However, only a month later, they moved out and separated. Reyes still visited the children while Gamez and the children lived in various hotels in Houston. On June 27, 2011, Gamez had another a daughter, A.G., but Reyes is not the father. The last time Gamez and Reyes lived together was in 2012 when Gamez and her four children moved in with Reyes, Reyes's girlfriend Ilia Quinonez, and Quinonez's daughter I.E. in Austin. Gamez testified that after three weeks of living with Reyes and Quinonez in Austin, she realized Reyes was not going to leave Quinonez to be with her. At that point, Gamez and the children moved back to Houston.

In April of 2012, Reyes and Gamez entered into a custody agreement concerning G.S. and M.S. Gamez claimed that her relationship with Reyes went "back and forth." In 2014, Reyes and Gamez began "secretly" communicating; the children were unaware that they were talking about potentially getting back together. Reyes admitted that he lied to Gamez about the possibility of reconciliation in an effort to see his children again. Around the same time, P.G., who was now around nine years old, wrote a sexually explicit letter to a boy she liked at school. Gamez confronted her about the letter, asking if the boy had touched her. P.G. responded that the boy had touched her "behind." According to Gamez, when she asked P.G. if anyone else had touched her, P.G. claimed that Reyes touched her. More specifically, P.G. detailed three separate occasions of sexual abuse. First, P.G. told Gamez that while they were living in Georgetown, Reyes would rub his penis in between her buttocks until he ejaculated. According to P.G., this would happen every Sunday while Gamez was at work. P.G. claims she would scream for her brother, but he was too little to help. Secondly, while she lived in Austin with Reyes and Quinonez,

3

P.G. asserted Reyes would perform oral sex on her; she claims this happened two or three times. And finally, P.G. claimed that when they lived in the hotels in Houston, Reyes would grab her at the pools and hot tubs and act like he was humping her from behind.

Gamez called CPS about the new allegations of sexual abuse, and the case was assigned to Detective David Kelly from the Austin Police Department. No medical or forensic evidence was admitted at the trial, but the jury heard testimony from several witnesses, including Detective Kelly, Gamez, P.G., Montes, Gamez's cousin, Reyes's mother and father, Reyes's coworker, Quinonez, I.E., CPS caseworker Francisca Jimenez, and William Lee Carter, the State's psychologist.

At trial, P.G., who was now twelve years old, reasserted her allegations of sexual abuse against Reyes, including the 2009 allegation that was ultimately dismissed by CPS. Concerning the 2009 allegation, P.G. testified, "when [CPS] asked me, has anyone touched you, I always told them no because I was scared . . . that [Reyes] would do something."

Carter testified that children who are sexually assaulted frequently delay telling others about the incident because children often feel afraid or feel somehow responsible for the incident. On cross-examination, Carter was questioned concerning the research of false memories and "source monitoring," which, according to the testimony at trial, is the theory that young children can be taught to believe something as true even though it never actually occurred.

The State abandoned count two, and the jury found Reyes guilty on counts one and three. The State waived count three. The jury assessed punishment at seventeen years' confinement in the Institutional Division of the Texas Department of Criminal

4

Justice. The trial court pronounced sentence as assessed by the jury. This appeal followed.

## II. RULE 403

In his first issue, Reyes contends the trial court abused its discretion in overruling his Rule 403 objection to evidence of P.G.'s 2009 outcry of sexual abuse being introduced through Montes and caseworker Jimenez. Reyes argues the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403.

### A. Standard of Review and Applicable Law

We review the admission of extraneous-offense evidence for abuse of discretion. *See De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *Id.* at 343–44.

Rule 403 states that a trial court may exclude relevant evidence if the evidence's "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. However, courts presume that the probative value of relevant evidence exceeds any potential danger of unfair prejudice until proven otherwise. *See Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (en banc) (op. on reh'g). A trial court's decision on a Rule 403 objection is "rarely" disturbed and is given "an especially high level of deference." *United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007); *see Robisheaux v. State*, 483 S.W.3d 205, 218 (Tex. App.—Austin 2016, pet. ref'd); *see also Garza v. State*, No. 13-17-00677-

CR, 2018 WL 3655519, at *4 (Tex. App.—Corpus Christi Aug. 2, 2018, no pet.) (mem. op., not designated for publication). When performing a Rule 403 analysis, the trial court

> must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. Of course, these factors may well blend together in practice.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

When the trial court erroneously admits evidence, it is usually considered a non-constitutional error, meaning that we will disregard the error as long as the substantial rights of the complaining party were not affected. *See* TEX. R. APP. P. 44.2(b); *Lopez v. State*, 288 S.W.3d 148, 165 (Tex. App.—Corpus Christi 2009, pet. ref'd). Substantial rights are not affected by the erroneous admission of extraneous acts if the appellate court, "after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *See id.* To determine whether the error adversely influenced the jury, we consider:

> (1) testimony or physical evidence admitted for the jury's consideration; (2) the nature of the evidence supporting the verdict; (3) the character of the alleged error and how it might be considered in connection with other evidence in the case; (4) the jury instructions; (5) the State's theory and any defensive theories; (6) closing arguments; (7) voir dire; and (8) whether the State emphasized the error.

*Id.* at 157.

**B. Analysis**

Reyes acknowledges that all evidence against a defendant in a criminal case is inherently prejudicial. *See Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013).

6

He argues, however, evidence of the 2009 outcry is unfairly prejudicial in this case because there was no physical or medical evidence to corroborate the allegations raised in the indictment. Therefore, according to Reyes, the jury was more likely to become confused and give improper weight to the 2009 outcry, potentially leading the jury to convict Reyes based on the alleged 2009 offenses instead of the alleged 2012 offenses. Furthermore, Reyes argues the probative value of the 2009 outcry evidence is very low because the State did not need it to convict Reyes and the 2009 outcry did not actually lead to any charges being filed.

The State, on the other hand, argues the trial court did not abuse its discretion because the 2009 outcry evidence was highly probative of P.G.'s credibility. P.G. alleged Reyes performed oral sex on her in 2012, but she delayed making her outcry statement until 2014, and so the State asserts it introduced evidence of the 2009 outcry statement to explain the delay. Additionally, the State contends that its need for the 2009 outcry statement is even higher in a case like this where there is no physical evidence. According to the State, because its case against Reyes largely rested on P.G.'s credibility, it was paramount to explain that she attempted to make an outcry earlier but was so scared of what Reyes might do that she decided not to participate in forensic testing and told CPS workers that there was no sexual abuse. We agree with the State.

It is true that the uncorroborated testimony of a child victim alone is sufficient to support a conviction of aggravated sexual assault of the child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07 (West, Westlaw through 2017 1st C.S.); *Gonzalez v. State*, 522 S.W.3d 48, 57 (Tex. App.—Houston [1st Dist.] 2017, no pet.). In that vein, Reyes is technically correct that the State did not need the 2009 outcry evidence to convict him.

7

However, the Texas Court of Criminal Appeals has addressed a similar argument before. *See Wheeler v. State*, 67 S.W.3d 879, 889 (Tex. Crim. App. 2002) (en banc). In *Wheeler*, the Court noted:

> Here, the State needed to show that the offensive touching actually occurred, which was a hotly contested issue. This Court has recognized that in prosecutions for sexual offenses, a successful conviction "often depend[s] primarily on whether the jury believe[s] the complainant, turning the trial into a swearing match between the complainant and defendant." Because numerous witnesses testified to appellant's lack of opportunity to sexually molest S.E., the rebuttal testimony by S.S. provided, at a minimum, the "small nudge" towards contradicting appellant's defensive theories and towards proving that the molestation did indeed occur. S.S.'s testimony showed an event quite similar to the charged event: the defendant reaching underneath a young girl's outer clothing and touching her private parts while another family member was close by.

> In this case, the trial court could reasonably conclude that the State had a great need for rebuttal evidence to counteract the small parade of appellant, his family, his son's friend, and a CPS investigator, who testified, in essence, that appellant is not the type to abuse children and did not and could not have done so on these two occasions. One little girl said the events did occur. She was pitted against six defense witnesses whose testimony asserted or implied the events did not occur and that the motive for S.E.'s testimony was money from a civil lawsuit.

> While evidence of an extraneous sexual offense will always carry emotional weight and the danger of impressing the jury in an irrational and indelible way, our rules of evidence require the exclusion of relevant evidence only if the danger of unfair prejudice, delay, or needless repetition substantially outweighs the probative value. We conclude that the trial court's decision to admit the extrinsic extraneous offense in this case fell within the zone of reasonable disagreement and thus was not an abuse of discretion.

*Id*. at 888–89 (internal citations omitted).

We find the reasoning in *Wheeler* informative for the present case. This is a case involving an alleged sexual offense with no physical or forensic evidence. Reyes called multiple witnesses, including himself, both of his parents, his girlfriend, and his girlfriend's daughter, to testify that the alleged offenses could not have occurred and that Reyes was

8

incapable of committing such offenses.  The trial court "could reasonably conclude that the State had a great need" for the 2009 extraneous offense evidence because the State needed to bolster P.G.'s credibility in this "swearing match."  *See id*.  And while extraneous offense evidence will inherently always carry emotional weight and the danger of being unfairly prejudicial or misleading the jury, the 2009 outcry evidence should only be excluded "if the danger of unfair prejudice, delay, or needless repetition substantially outweighs the probative value."  *Id*.  The 2009 outcry evidence did not take a long time to develop and it was not repetitive of other evidence adduced at trial.  *See id*.  We conclude that the trial court's decision to admit the extraneous offense evidence fell within the zone of reasonable disagreement and thus was not an abuse of discretion.  *See id*.; *see also Gigliobianco*, 210 S.W.3d at 641–42.  We overrule Reyes's first issue.

### III. POLYGRAPH EVIDENCE

In his second issue, Reyes argues that the trial court erred by denying his motion for mistrial; according to Reyes, the trial court should have granted his motion for mistrial because a witness for the State mentioned polygraph examinations.

### A. Standard of Review and Applicable Law

We review a trial court's ruling on a motion for mistrial under an abuse-of-discretion standard of review.  *See Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007).  "The test for abuse of discretion is . . . whether the trial court acted without reference to any guiding rules or principles.  The bare fact that a trial court may decide a matter differently from an appellate court does not demonstrate an abuse of discretion."  *State v. Simpson*, 488 S.W.3d 318, 322 (Tex. Crim. App. 2016) (internal citations omitted).

9

When a motion for mistrial is filed, a trial court conducts an "appellate function" to determine whether the alleged misconduct is "so harmful that the case must be redone." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (en banc). Thus, a mistrial is only mandatory in extreme circumstances where the prejudice caused is incurable. *See id*.

"Due to their inherent unreliability and tendency to be unduly persuasive, the existence and results of polygraph examinations are inadmissible for any purpose in a criminal proceeding on proper objection." *Martines v. State*, 371 S.W.3d 232, 250 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Tennard v. State*, 802 S.W.2d 678, 683 (Tex. Crim. App. 1990) (en banc)); *see also Leonard v. State,* 385 S.W.3d 570, 577 (Tex. Crim. App. 2012) (op. on reh'g). However, merely mentioning a polygraph examination does not automatically "constitute reversible error." *Jasso v. State*, 112 S.W.3d 805, 813 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd); *see also Williamson v. State*, No. 13-12-294-CR, 2013 WL 3894982, at *2 (Tex. App.—Corpus Christi July 25, 2013, no pet.) (mem. op., not designated for publication).

In determining whether a mistrial should have been granted on this basis, reviewing courts consider: "(1) whether the question exhibited bad faith by being designed to elicit that a polygraph was taken or what the results of that polygraph were; and (2) whether the effect of the evidence is to impeach the defendant's defensive theory or to bolster the state's case." *Buckley v. State*, 46 S.W.3d 333, 337 (Tex. App.—Texarkana 2001, pet. ref'd, untimely filed); *see Jasso*, 112 S.W.3d at 813; *see also Williamson*, 2013 WL 3894982, at *2. As a general rule, if a polygraph examination is mentioned at trial but the results are not revealed, then an instruction to disregard is

sufficient to cure any error. *See Tennard*, 802 S.W.2d at 683; *Martines*, 371 S.W.3d at 250; *Jasso*, 112 S.W.3d at 813.

## B. Analysis

Detective Kelly testified during the State's case-in-chief that he had been appointed to the case. The following exchange occurred as Detective Kelly discussed what role he had performed in the investigation:

[State]: Okay. And so after that, kind of basically once you turn the case over to the prosecutor, did you do anything additional on this case?

[Kelly]: The only thing I can—once it was turned over to—for grand jury review, I didn't do anything after that point. Only thing I was—had, you know, thought about at the time that I didn't discuss was reaching out to Mr. Reyes to—at the conclusion of my interview, was to offer, you know, taking a polygraph to—

[Reyes's Counsel]: Judge, approach? I don't know what we're supposed to do. He's bringing up the polygraph, which is inadmissible.

[State]: Yeah. I mean, I didn't know he was going there, so—

[Court]: Whatever you're saying, I can't hear.

[The jury exits]

[Court]: Okay.

[State]: So I think that the easiest way to do this since he's made an objection is for the Court to instruct the jury that—however you want it worded. Whatever you just said is fine.

. . .

[State]: My question was just like, So you didn't do anything further in this case, and then he went to polygraph, which I was not expecting. So—

. . .

11

[Nunez's
Counsel]: And then, Judge, we'd ask for that limited instruction. Then we ask for a mistrial based on that statement of the polygraph.

[Court]: And I—but I already said I'd give the limiting instruction, right?

[Nunez's
Counsel]: Yes, sir.

[Court]: And I will deny your motion—

[Nunez's
Counsel]: Yes, sir.

[Court]: —for a mistrial. All right. Let's bring them back in.

[Jury returns]

[Court]: Okay, jury members. We're back on the record in State versus Sergio Reyes, and our last question—the response to the last question included a reference to a polygraph test, and it's well known in criminal law that polygraph tests are not admissible in court proceedings and certainly not admissible in this court proceeding. So you're instructed to disregard the reference to that statement. We don't know if a polygraph was offered and we don't know if it was given, and you're instructed to disregard that statement and not draw any conclusions from what was said nor any kind of inferences that you might think flow therefrom. In other words, disregard it completely, okay?

Reyes contends that "[i]t is undeniable that the reference to the polygraph examination had the potential to prejudice the jury against Appellant." However, Reyes needed to show more than a mere potential harm; he needed to demonstrate an incurable error that was so harmful as to require the trial to be redone. *See Hawkins*, 135 S.W.3d at 77. In the present case, there is no evidence in the record of bad faith on the State's part in eliciting this testimony; to the contrary, the State expressed its surprise when Detective Kelly mentioned a polygraph examination. *See Buckley*, 46 S.W.3d at 337;

12

*Jasso*, 112 S.W.3d at 813; *see also Williamson*, 2013 WL 3894982, at *2. Furthermore, the effect of Detective Kelly mentioning a polygraph examination was unlikely to impeach Reyes or bolster the State. Detective Kelly did not mention the results of a polygraph examination or imply that the results of the examination were unfavorable to Reyes; he merely mentioned that he considered administering a polygraph examination. *See Buckley*, 46 S.W.3d at 337; *Jasso*, 112 S.W.3d at 813; *see also Williamson*, 2013 WL 3894982, at *2. Lastly, the trial court gave an instruction to the jury to disregard the reference to the polygraph examination, and we presume jurors follow the trial court's instructions as presented. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). Reyes has failed to demonstrate why the trial court's instruction to disregard was ineffective. *See Tennard*, 802 S.W.2d at 683; *Martines*, 371 S.W.3d at 250; *Jasso*, 112 S.W.3d at 813. Therefore, we conclude that the trial court did not abuse its discretion in denying Reyes's motion for mistrial. *Webb*, 232 S.W.3d at 112. We overrule Reyes's second issue.

## IV. LEGAL SUFFICIENCY

In his third issue, Reyes argues that the evidence was legally insufficient to support his conviction for aggravated sexual assault.

## A. Standard of Review and Applicable Law

When reviewing the legal sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "The prosecution bears the

13

burden of proving all elements of the offense charged, and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements." *Niles v. State*, 555 S.W.3d 562, 569 (Tex. Crim. App. 2018). The factfinder is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *See Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008); *Bargas v. State*, 252 S.W.3d 876, 887 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("The jury may choose to believe or disbelieve any portion of the witnesses' testimony."). We give great deference to the trier of fact and assume the factfinder resolved all conflicts in the evidence in favor of the verdict. *See Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We will uphold the verdict unless the factfinder "must have had reasonable doubt as to any essential element." *Id*. A reviewing court cannot overturn a conviction simply because it disagrees with the jury's verdict. *See Bargas*, 252 S.W.3d at 887.

"Courts give wide latitude to testimony given by child victims of sexual abuse." *Gonzalez Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.—Corpus Christi 2008, no pet.). The child complainant's description of the abuse need not be precise. *See id.* This rule "reflect[s] the important public policy that we cannot expect the child victims of violent crimes to testify with the same clarity and ability as is expected of mature and capable adults." *Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990) (en banc). The testimony of a child victim alone, uncorroborated by medical or physical evidence, is sufficient to support a conviction of aggravated sexual assault of the child. TEX. CODE CRIM. PROC. ANN. art. 38.07; *see Gonzalez*, 522 S.W.3d at 57.

Sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge and as authorized in the indictment. *Malik v. State*, 953

S.W.2d 234, 240 (Tex. Crim. App. 1997) (en banc). Such a charge in this case would state that a person commits aggravated sexual assault of a child if the actor intentionally or knowingly caused the sexual organ of a child under the age of fourteen to contact the mouth of the actor or another person. TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(iii).

**B. Analysis**

Reyes acknowledges that uncorroborated child testimony alone can support a conviction for sexual assault of a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07; *Gonzalez*, 522 S.W.3d at 57. Nevertheless, he contends that P.G.'s testimony is "wrought with inconsistencies" and "lacks logistical sense." In addition, Reyes reiterates that there is no physical or forensic evidence in this case; P.G. is the sole witness to the alleged offenses. Thus, Reyes argues that the evidence was legally insufficient to support his conviction. We disagree.

P.G. testified she was about seven years old when she lived in Austin with Reyes, his girlfriend Quinonez, and Quinonez's daughter, I.E. The sleeping arrangement, according to P.G. and Gamez, was as follows: Reyes and Quinonez slept in one room, Gamez and two of her kids slept on the living room couch, and I.E., P.G., and P.G.'s baby sister slept on a pair of twin mattresses pushed together on the floor, with P.G. sleeping in the middle. P.G. testified that during the three weeks that she lived in Austin with Reyes, he performed oral sex on her two or three times: "[Reyes] would—he started taking down my underwear, and he put his mouth on where my private part was and started licking me."

On the other hand, Reyes, Quinonez, and I.E. all testified that P.G. slept on a bunk bed during the three-week period that she lived in Austin. Quinonez testified that the

15

bunk bed was made of metal and made a lot of noise anytime someone moved around or got off of the bed. Thus, Reyes argues P.G.'s allegations were illogical because they required the jury to believe that Reyes performed oral sex on P.G. either: (1) on a noisy bunk bed in a room with other children; or (2) on a pair of twin mattresses shoved together on the floor with P.G. sleeping in between I.E. and P.G.'s baby sister. In other words, Reyes claims it would have been impossible for him to commit the alleged offenses in either scenario without being detected. However, P.G. testified that her baby sister and I.E., who was about nine or ten years old at the time, were heavy sleepers. P.G. also claimed that when Reyes would perform oral sex on her, she would lay frozen out of fear.

We do not find anything so illogical or inconsistent with P.G.'s testimony as to cause a rational jury to necessarily have reasonable doubts about her testimony. *See Laster*, 275 S.W.3d at 517. We assume a rational jury resolved any supposed conflict in favor of the verdict. *See id*. The jury was free to believe P.G. and Gamez's description of the sleeping arrangements rather than Reyes's description. *See Bargas*, 252 S.W.3d at 887. Concerning the specific elements, there was no doubt that P.G. was less than fourteen at the time of the alleged acts. P.G. gave an adequate description of the alleged sexual acts. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(iii); *Gonzalez Soto*, 267 S.W.3d at 332. P.G.'s testimony alone was sufficient to support the conviction. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07; *Gonzalez*, 522 S.W.3d at 57. Therefore, viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found the essential elements of aggravated sexual assault of a child beyond a reasonable doubt. *See Clayton*, 235 S.W.3d at 778. We overrule Reyes's third issue.

**V. CONCLUSION**

16

We affirm the trial court's judgment.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
18th day of April, 2019.

17